[Crim. No. 2370. First Dist., Div. One. Apr. 29, 1946.]

THE PEOPLE, Respondent, v. EDWARD ORECK et al., Appellants.

Stern & Grupp and Morris M. Grupp for Appellants.

Robert W. Kenny, Attorney General, David K. Lener and Alberta Gattone, Deputies Attorney General, Edmund G. Brown, District Attorney, and Thomas Lynch, Assistant District Attorney, for Respondent.

PETERS, P. J.—Edward Oreck and Ben Kuhl, together with two others, were charged by information with violating sections 337a, subdivisions 1, 2, 4 and 6, of the Penal Code. They were found guilty after a trial by jury. From the judgment of conviction and from the order denying their motion for a new trial they appeal.

Section 337a relates to "Pool-selling, bookmaking, bets and wagers. Penalty." Subdivision 1 prohibits pool-selling or

bookmaking; subdivision 2 prohibits the keeping of premises for the purpose of recording bets or wagers; subdivision 4 prohibits the recording of bets and wagers; while subdivision 6 prohibits the laying, making, offering or accepting of any bets or wagers. The information charges that the two appellants, together with Louise Borland and Louis Lichtenstein violated these various subdivisions on December 6, 1944. The court advised a verdict in favor of Louise Borland, while Louis Lichtenstein was called as a witness for the People under section 334 of the Penal Code, and, as a result, the prosecution was dismissed against him.

On this appeal the appellants raise several questions as to the admissibility of certain evidence, charge that certain comments of the trial judge were prejudicially erroneous, allege that evidence was erroneously admitted of other offenses, and make certain other contentions. None of these objections need be considered for the reason that appellant Oreck took the stand on his own behalf, and we are of the opinion that from his evidence alone the appellants demonstrated, as a matter of law as well as of fact, that they were guilty of the offenses charged. Even if errors were committed, such errors would not be prejudicial. (See *People* v. *Hamet,* 69 Cal.App.2d 546 [159 P.2d 702].)

The evidence produced by the prosecution need not be reviewed in detail. On the afternoon of December 6, 1944, two police officers entered the suite of rooms numbered 1202 in the building known as 625 Market Street. Admittedly, the premises were leased to Oreck under a fictitious name. When the police officers entered they found all the defendants, with the exception of Oreck. This appellant arrived at the premises some time later. In the inner room were seven telephones, all with separate numbers. It is admitted that Oreck secured these telephones under various fictitious names. While the officers were there the telephones were ringing and the officers took down the conversations. All the conversations had to do with placing bets or lay offs on horse races, or with asking information about horse races being run that day. Appellants challenge the admissibility of such conversations as hearsay. For reasons already stated this contention need not be discussed.

After Oreck arrived the officers, without Oreck's consent and without a warrant, broke open a safe located on the

premises and discovered various documents all customarily used by bookmakers. Assuming this evidence was illegally secured its admissibility is no longer open to question. (*People* v. *Mayen*, 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383]; *People* v. *Gonzales*, 20 Cal.2d 165 [124 P.2d 44]; *People* v. *Kelley*, 22 Cal.2d 169 [137 P.2d 1].) Included within the documents so secured were run down sheets, scratch sheets, betting pads, betting records, etc., many of them dealing with races being held on December 6, 1944. Lichtenstein, called under section 334 of the Penal Code, testified that he worked on the premises for Oreck and that it was his job, and the job of the other employees to register bets and commissions on horse races coming in over the telephones. He testified that on December 6th the betting pads, daily bulletins and scratch sheets, etc., were out of the safe until the police knocked on the door when they were hurriedly hidden in the safe. On cross-examination he admitted that the bets he took on December 6th were all so-called "lay off" bets.

As already stated, Oreck took the stand on his own behalf. He frankly admitted that he operated the establishment and that appellant Kuhl was one of his employees. He admitted that the sole purpose of the establishment was to deal in transactions relating to horse races. But it was his contention on the trial, and it is the main contention of appellants on this appeal, that the transactions in question do not violate section 337a of the Penal Code. He testified that his transactions were entirely with bookies, that the place was not open to the public, and that bets with the public were never taken in that office. He testified that he operated what is known as a "lay off" business, and that such business is not a bookie business at all, but involves transactions wherein the lay off man merely underwrites or insures the bookie against losses on those portions of the bookie's bets that the bookie desires to lay off. He described the nature of his business as follows: That bookies were small operators with limited capital who could not afford to stand too large a loss; that in such event the bookie would lay off the whole or any portion of any bets taken by him on any horse with the lay off man; that as to such lay off transactions the agreement between the lay off man and the bookie was that if the horse in question won, the lay off man would pay the bookie the total amount of the losses of the bookie on the whole or part of the bet or bets so placed with the lay off man; that

if the horse lost, the bookie would pay the lay off man a portion of his winnings, usually 50 per cent, as a commission for having underwritten the bet; that as a lay off man he had no interest of any kind in the amount of any bet made by the bookie with one of his customers; that the arrangements with the bookies were on a monthly basis; that at the end of each month the amounts would be accumulated to see who had to pay; that if the losing horses left a balance on the books the bookie would pay him 50 per cent of that amount as a premium; that if the balance was in favor of winning horses he, as the lay off man, would pay the bookie all of such losses.

Sergeant Dyer, one of the arresting officers, and a police expert on bookmaking, testified that there was no difference between a bet and a lay off because the lay off mainly involves the transfer, in whole or in part, of the original bet to another. When asked by appellants' counsel if it were not the fact that the lay off man was merely acting as an underwriter for the bookies, he replied (R. T. p. 65): "No, I wouldn't say that. He is making a pool, he is gathering a pool from many sources, and he is engaging in gambling, in a bet with these various sources, and he can lose, and according to his records that we seized he did lose on certain of those and he won on other days, and at the end of the month amounts of money showed in these records we seized that the place had won. There is no underwriting. It is gambling simply on how the horses were going to run." He was then asked what was the distinction between a bet and a lay off and answered as follows (R. T. p. 65): "A lay off is simply a bet that the man who received it can't afford to hold, because there is too much involved. The usual reason is that if a horse paid a long price he would not be able to pay it, so rather than hold it he passes it off to somebody who can take the risk, who handles more money and bigger money and who has a bigger pool to draw from." He was then asked if a bet was the same thing, and testified (R. T. p. 66): "That is a lay off of the bet, that is passing the bet on to somebody else that can afford the risk ... You want to know the difference between a bet and a lay off. A bet is directly a bet between Mr. Lynch, say, and myself. If Mr. Lynch decides afterwards his means are not sufficient to take care of the bet he may lay it off with say Officer Overstreet or any other person, or lay any part of it off. The original

bet with me still stands, but he may keep part of it or lay part of it or all of it off—pass part of the hazard on to some-one else.'' He was then asked: ''And all he passes on is the hazard in that case?'' ''A. Or part of it.'' There was con-siderable more testimony, both from Oreck and Dyer, as to the general nature of a lay off, but enough has been said to indicate the nature of the establishment that was being operated by appellants.

With utmost seriousness and at considerable length the appellants urge that the transactions admittedly entered into by them do not constitute bets or wagers within the mean-ing of section 337a of the Penal Code. It is their contention that in order to constitute a bet within the meaning of that section there must be two parties to the transaction who are on opposite sides of the hazard, that is, one person must lose and one person must win; that in a lay off transaction both parties, the bookie and lay off man, are on the same side of the hazard; that if one loses the other loses; that if one wins the other wins; that the bookie deals with the bettors who are his customers; that the lay off man never deals with the bet-tor; that the bookie is not obligated to lay off all or any of the bets taken by him, but may lay off as many bets or as much of any one bet as he decides. These arguments seem to us so unsound and so unrealistic that but little discussion is necessary to demonstrate their fallacy. It is perfectly ob-vious that unless the small operator could ''underwrite'' his losses he could not operate. The lay off man makes it pos-sible for the bookie to stay in business. For that reason the lay off man is a principal under section 31 of the Penal Code in that he directly aids or abets the bookie in violating the law. Moreover, a bet is a wager or agreement between two or more persons that a sum of money or other valuable thing, contributed by those taking part, shall become the prop-erty of one or the other of them, depending on the happen-ing of some future event, at present uncertain. (12 Cal.Jur. p. 1088, § 1.) Tested by this standard the transactions between the bookies and appellants, as a matter of law, were bets. A practical example will demonstrate that this is so. If a customer of a bookie bets $5.00 on horse X to win a certain race, and the track odds are 5-1, if that horse wins the bookie must pay the customer $25, while if it loses the bookie wins $5.00. Now, if before the race, the bookie lays off that $5.00 bet with a lay off man, what is the result? If the horse wins,

the bookie must pay the customer $25, but he is reimbursed to the extent of $25 by his bet with the lay off man. In a very real sense the bookie has won that bet with the lay off man, and the lay off man has lost. But if the horse loses, the bookie wins $5.00 from his customer, but he must pay the lay off man $2.50. In a very real sense the bookie has lost and the lay off man has won on that transaction. From a realistic as well as a legalistic standpoint what is really involved in a lay off is that the bookie is rebetting the whole or a part of his customer's bets with the lay off man at much better odds than he gives his own customers. The term "lay off" is defined in Webster's Dictionary, insofar as it relates to horseracing, as "to hedge a bet."

Another way at looking at the transaction is that the lay off man is simply buying the whole or a piece of the original bet, and thus becomes a principal to the original bet. It could also be argued that the customer becomes the third party creditor beneficiary of the contract between the bookie and lay off man. In another sense, the bookie can be considered as an agent or a mere intermediary for the lay off man as to those bets or portions of bets transferred to the lay off man, and the lay off man becomes the undisclosed principal.

It is thus quite apparent that no matter how the transactions described by appellant Oreck be considered, as a matter of law they constitute bets or wagers within the meaning of section 337a of the Penal Code. Appellants by their own testimony have demonstrated that they are guilty of the offenses charged.

 The appellants next contend that the trial court erroneously sustained objections to certain questions aimed at showing that the police discriminated against horse race betting in that the police did not raid certain establishments specializing in election and other types of bets. Appellants did not offer to prove that they were being prosecuted because of their race, color, religion, or political beliefs. They simply sought to show that others equally guilty were not being prosecuted. They contend that under the rules announced in *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Williams* v. *Mississippi,* 170 U.S. 213 [18 S.Ct. 583, 42 L.Ed. 1012], and the dissenting opinion in *People* v. *Darcy,* 59 Cal.App.2d 342, 354 [139 P.2d 118], such facts, if proved, would demonstrate that they had been denied equal protection of the laws. In the cases cited it

was claimed that the persons involved were being prosecuted because of their race, color, religion or political beliefs. Here the claimed discrimination is that those engaged in horse race betting are being prosecuted while those who run other types of illegal betting establishments are not. Such type of discrimination, if discrimination it be, is not within the rule of the above cases. It is not a denial of equal protection that one guilty person is prosecuted while others equally guilty are not. This is clearly pointed out in the majority opinion in the Darcy case, and likewise in the dissent in that case. At page 358 of the dissent it is stated: "It is, of course, the law that a person committing a crime cannot claim an unlawful discrimination upon a mere showing that other persons or classes of persons have committed the same offense and have not been prosecuted therefor. The cases cited in the majority opinion clearly and properly establish that principle." (See *People* v. *Montgomery*, 47 Cal. App.2d 1 [117 P.2d 437]; *Ah Sin* v. *Wittman*, 198 U.S. 500 [25 S.Ct. 756, 49 L.Ed. 1142].) The proffered evidence for these reasons was inadmissible.

 Appellants next contend that subdivisions 2 and 5 of section 337a of the Penal Code are void in that they define offenses not included within the title of the statute in violation of article IV, section 24, of the Constitution. The title to the statute reads as follows: "An act to amend section three hundred and thirty-seven a of the Penal Code relating to gaming and gambling by pool-selling, bookmaking, bets and wagers, and providing the punishment for the violation thereof." (Stats. 1911, chap. 7, p. 4.) It is the theory of appellants that subdivisions 2 and 5 of the section (one of the charges against appellants is a violation of subd. 2, but they are not charged with a violation of subd. 5) do not refer to the offenses of gaming, pool selling, bookmaking, or making bets and wagers, but refer to a completely separate subject, that is, the keeping, occupying, or owning the premises used for these purposes or having therein the various paraphernalia used for such purposes. The point is obviously without merit. Where the body of the act embraces provisions germane to the general subject stated in the title, or when the title suggests the field of legislation which is included within the text of the act, the title will be held to be sufficient. (*People* v. *Jordan*, 172 Cal. 391 [156 P. 451].) The title should be liberally construed so as to

uphold the statute if a reasonable reference to the subject matter included therein may be ascertained from the language employed. (*Hecke* v. *Riley,* 209 Cal. 767 [290 P. 451] ; *Pierce* v. *Riley,* 21 Cal.App.2d 513 [70 P.2d 206].) It is not necessary to embrace in the title every detail of the enactment. It is not necessary that the title should catalogue the contents of the statute. (*People* v. *One Ford V8 Tudor Sedan,* 12 Cal.App.2d 517 [55 P.2d 908] ; *People* v. *Buyle,* 20 Cal.App.2d 650 [68 P.2d 268].) Tested by these standards the title is clearly sufficient. The title refers to gaming and gambling by pool selling, bookmaking, bets and wagers. Obviously, such a title is broad enough to include the subject of keeping, occupying, or owning the premises or paraphernalia by or in which these acts are carried on. The title is sufficient.

The judgment and order appealed from are affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied May 14, 1946, and appellants' petition for a hearing by the Supreme Court was denied May 27, 1946.