[Crim. No. 4844.  Second Dist., Div. Two.  Oct. 8, 1952:]

## THE PEOPLE, Respondent, v. GENEVIEVE ALLEN, Appellant

Murray M. Chotiner for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

MOORE, P. J.—Convicted of pool selling and bookmaking (Pen. Code, § 337a, subd. 1) defendant demands a reversal of the judgment on the grounds of the insufficiency of the evidence and error in the admission of certain telephonic conversations.

Appellant was the sole occupant of a two-room apartment on North Ardmore Street in the west side of Los Angeles. When four police officers called there they found the sheets of a metropolitan daily newspaper scattered over the bed, a telephone on the night table and some pieces of scratch paper on the floor. After Officer Foster had answered a number of telephone rings, Miss Stockley, a secretary of the Hollywood police station, entered and assumed the task of answering the telephone which rang 11 times during her 30 minutes' visit. The following is a transcript of her testimony with reference to the telephone.

"THE WITNESS: The first time I picked up the phone a party said, 'This is Laura. He never did call me.'

"I said, 'right.' She then hung up. . . .

"The next time the phone rang a woman said, 'Betty, Dunkirk 30886,' and hung up.

"The next time the phone rang the party said, 'Yes, Sunset,' and then hung up.

"The next time the phone rang a party said, 'This is Cliff at Dunkirk 7-0378.'

"In the following conversation a man answered, and he said, '99,' and hung up.

"The following man said, 'O.B. for Red,' and hung up.

"The following man said, 'Tex, Normandy 2-0818. Have them call me right back,' and hung up.

"The next party said, 'Oregon at Dunkirk 7-0729,' and hung up.

"The next party said, 'Ken.' I told him that the other end of the line was dead; we were taking them there.

"He said, 'One to win on 3 in the fifth at Downs,' and hung up.

"The next party called and said, 'Curly, Dunkirk 2-0319.' I told them that the other line was dead; we were taking them there; what would he have. And he then gave me four Churchill Downs to win, $4 parlay to Jet Ace in the fifth, Golden Gate $2 daily double Kings Boy to Alibi and $2 daily double of Kings Boy to Shadow Count.

"The next party who called was a man stating, 'This is Beverly, Mutual 0897.'

"I told him, 'Right.' I said that we were taking them at this end as the other end was dead.

"He said, 'Is this Normandy 2-0818?' I checked the number as he said it and told him that was correct.

"This man then gave me a very long list of horses' names and amounts. . . .

"THE COURT: That will be stricken. Tell us what he said.

"A. 'Four daily doubles, Kings Boy to Schwinn, LaJolla High to Schwinn, Car Door to Schwinn, $4 each, Kings to Smith $2, $10 to win and $5 to place on Schwinn, Tuba Lady, I believe about the fourth.' That was his conversation.

" '$5 to win, Gustave in the sixth, $5 win, four and four parlay, Tuba Lady to Gustave, Mysteria in the sixth, $10 to win and $7 to place.'

"The next was a woman who called and she said, 'This is Sunset, I am in a phone booth. People are going in and out. Would there be any chance of his getting to me right away?'

"I told her I would try to have them call. And that was it."

Officer Foster qualified as an expert in the custom and manner of bookmaking as it is conducted in Los Angeles County. Included among the paraphernalia listed by him as commonly used by bookmakers were pencils, pieces of paper, telephone, sporting section of the newspaper. He testified that bets are commonly transmitted over the telephone; the bettor calls a "phone spot," gives his name or code number and a list of horses, designates whether he wishes a round robin, a parlay or whether he wishes to bet across the board, or to win, place or show, giving the amount of each bet. Taking the sporting section of the newspaper he had found in appellant's room, published on the day of her arrest, the witness pointed out that a horse named Blue Point on that day ran in the fourth race at Churchill Downs. Also, the sports' section reported two-year-old Jet Ace to run in the fifth race on the same track. Also, all the names mentioned by Miss Stockley were those of horses running at different tracks in the United States on that day and were in the sports section of the newspaper. The order taken by Miss Stockley with reference to Churchill Downs, the figures 4 and 2 were wagers on horses running at various tracks on that day. It is common practice for bookmakers to receive telephone calls from bettors who state their names and telephone numbers and hang up. Such calls are made to a relay spot and the data received there is transmitted to the bookmaker who in turn calls the bettor. Sometimes the bettor gives his name to the relay spot, others give a code

designation or telephone number. The relay spot transmits the names and numbers received from bettors without writing them on a memorandum.

■ Appellant violated the law not by taking bets from those who telephoned her relay spot, but by aiding the bookmaker to contact his patron. By giving such aid, the proprietor or keeper of the relay spot becomes a principal in vio lating the statute. (Pen. Code, § 31; *People* v. *Oreck,* 74 Cal. App.2d 215, 220 [168 P.2d 186].) ■ The proof contains all the essentials of guilt. Eleven calls in 30 minutes indicate a flourishing business. While some gave only their names or numbers, other calls related to horses mentioned in the newspaper which lay open on appellant's bed. Although she admits having been employed to receive and transmit calls, she protests her innocence of the criminal connection.

But when defiance of the law is openly asserted, the state requires more of a citizen than merely to vegetate and to encourage the violator. When one is employed to transmit such mysterious messages as those that came to appellant, one must know something of the nature of his associates and the source of his sustenance. A person of normal instincts will know, and his denials of knowledge of the occupation of his employer are not sufficient evidence to overcome the inferences arising from such facts as those established against appellant. In her closing brief appellant says the reasonable inferences deducible from the evidence are: (1) there was probably bookmaking being conducted some place; (2) appellant's apartment was not used for "recording bets"; (3) it was "used for taking telephone messages such as names and telephone numbers." But she asserts also (4) that it is a reasonable inference that she had no knowledge she was assisting someone at bookmaking. Appellant would have the court accept her denial of knowledge against another inference, to wit, that she knew she was aiding bookmaking in progress somewhere. After a trial court has upon substantial proof found the ultimate fact that the accused was consciously aiding and abetting a criminal enterprise, the reviewing court is powerless to reverse such finding. (*People* v. *Newland,* 15 Cal. 2d 678, 681 [104 P.2d 778].) Any woman who has the intelligence whereby to remain in her home and receive $35 per week for answering a telephone is wise enough to know that when strange voices speak to her in names and numbers which she in turn delivers to her employer, some law is held up to scorn.

However, appellant's denial of knowledge of the occupation of her employer was not from the witness stand. She said to the investigating officer that she was paid to receive calls and transmit them to a certain individual. In the light of such statement and her denial to the officer, her failure to testify has an alarming significance. Her failure to give a rational explanation under oath of having a telephone in her apartment over which she received calls from unknown persons at the rate of 22 per hour, some leaving their names, some their numbers, and others specifying the horses on which they wished to place bets and the amounts thereof, her failure to testify to her lack of knowledge of the business she was building and her pretended unconcern as to the occupation of her employer, were potent evidence in support of the judgment. (*People* v. *Ines,* 90 Cal.App.2d 495, 499 [203 P.2d 540]; *People* v. *Adamson,* 27 Cal.2d 478, 490, 491 [165 P.2d 3].) The facts adequately prove that the relay spot and appellant were integral parts of a bookmaking operation.

### No Error in Ruling on Evidence

While admitting that under *People* v. *Reifenstuhl,* 37 Cal.App.2d 402 [99 P.2d 564], telephonic conversations are admissible as proof of the character of the premises, appellant argues that since her apartment was not used as a place for receiving bets on horse races but merely as a relay spot, her conversations did not show the character of the premises. But if the relay spot is an integral part of a bookmaking operation, then all calls to it and all calls from it for the purpose of completing a bet on a horse race establish the character of business in which the relay premises are engaged. Not only does the use of one telephone serve to conceal both bookmaker and the bettor from public view (*People* v. *Reifenstuhl, supra,* 405), but the use of two or more telephones to effect the final act of consummating a bet will furnish greater protection to the illicit operator. Therefore, the relay spot must in all reason be a part of the bookmaker's design to place a greater distance between himself and the minions of the law.

The judgment and the order denying the motion for a new trial are affirmed.

McComb, J., and Fox, J., concurred.