[L.A. No. 30426. In Bank. Sept. 24, 1975.]

JOSE GUADALUPE MURGIA et al., Petitioners, v.
THE MUNICIPAL COURT FOR THE BAKERSFIELD JUDICIAL
DISTRICT OF KERN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Gerald Blank, Miguel F. Garcia, Peter Haberfeld, Mike Kogan, Richard Paez, Barbara Rhine, W. Kenneth Rice and Dennis Roberts for Petitioners.

Harold E. Shabo, A. Jane Fulton, Mark D. Rosenbaum, Daniel C. Lavery, Fred Okrand, John D. O'Loughlin and Jill Jakes as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Marjory Winston Parker and Susan E. Cohn, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**TOBRINER, J.**—We face here the narrow question whether the instant criminal defendants[1] may obtain a discovery order directing the prosecutor to produce information relevant to defendants' claim that various penal statutes are being discriminately enforced against them. Defendants, members of the United Farm Workers Union (hereafter UFW), allege that the law enforcement authorities of an entire county have engaged in a deliberate, systematic practice of discriminatory enforcement of the criminal law against UFW members and supporters. Defendants maintain that the equal protection clauses of the federal and state Constitutions safeguard individuals from such "intentional and purposeful" invidious discrimination and authorize defendants to raise such prosecutorial discrimination as a defense to the misdemeanor charges pending against them. The trial court denied all discovery on this "discriminatory prosecution" issue, and defendants now seek a writ of mandate challenging that ruling.

We have concluded that the trial court erred in denying the discovery motion on the ground that such alleged discriminatory prosecution, even if established, would not constitute a defense in the pending criminal proceedings. Over a decade ago, the United States Supreme Court recognized that the equal protection clause is violated if a criminal prosecution is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." (*Oyler* v. *Boles* (1962) 368 U.S. 448, 456 [7 L.Ed.2d 446, 453, 82 S.Ct. 501].) ■ Neither the federal nor state Constitution countenances the singling out of an invidiously selected class for special prosecutorial treatment, whether that class consists of black or white, Jew or Catholic, Irishman or Japanese, United Farm Worker or Teamster. If an individual can show that he would not have been prosecuted except for such invidious discrimination against him, a basic constitutional principle has been violated, and such a prosecution must collapse upon the sands of prejudice.

Although the prosecutor argues that the alleged criminal law violators before us should not be free of prosecution, the issue here is whether the *prosecution* is constitutionally free to select *only* these defendants and prosecute them *only* because they are members of a certain class, i.e.,

---

[1]Although defendants in the underlying criminal prosecutions are technically petitioners in the instant discovery proceedings, for convenience and clarity we shall refer to these individuals as "defendants" throughout this opinion.

members or supporters of a particular union. No constitutional provision prevents the full prosecution of all criminal law violators, so long as such prosecution is not tainted with invidious discrimination. ■ Defendants are entitled, however, to pursue discovery with respect to their claim that in the instant case such prejudice was in fact the moving force behind the pending criminal proceedings.

1. *The facts of the instant case.*

These six misdemeanor prosecutions, consolidated for purposes of the present discovery proceeding, emanate from picketing and organizational activities of the UFW in Kern County in the summer of 1973. All six defendants are UFW members and are charged with a variety of minor offenses, including driving without a license in one's possession, willful disobedience of a court order, malicious mischief and reckless driving.[2] According to the defendants' allegations, all of the charged incidents occurred while they were engaged in activities on behalf of their union.

Prior to trial, defendants filed motions seeking the dismissal of the charges on the ground that these prosecutions violated their constitutional right to the equal protection of the laws. Defendants alleged that the charges against them were instituted as part of a deliberate, systematic pattern of discriminatory enforcement of the state's penal laws against UFW members and supporters, executed by the Kern County District Attorney and Sheriff and by county law enforcement agents generally.

In conjunction with this motion to dismiss, defendants filed a discovery motion seeking to obtain documentary and testimonial evidence from law enforcement officials which, according to defendants, related to their discriminatory prosecution claim. In support of this discovery motion, defendants introduced more than 100 affidavits detailing numerous incidents of alleged discriminatory conduct toward UFW members and supporters on the part of Kern County law enforcement agents during the summer months of 1973.

---

[2]Specifically, Jose Guadalupe Murgia is charged with violation of Penal Code section 166, subdivision 4 (willful disobedience of a court order); Bernardina Sanchez and Refugial Rodriguez are charged with violation of Penal Code section 594 (malicious mischief); Jorge Claudio is charged with violation of Vehicle Code sections 12951, subdivision (a) (driving without a driver's license in possession), 21750 (failing to pass another vehicle to the left at a safe distance without interfering with the safe operation of the overtaken vehicle) and 23103 (reckless driving); and Duane Goff and Enrique Martinez are charged with violation of Vehicle Code section 23103 (reckless driving).

The bulk of these declarations related to allegedly discriminatory behavior by sheriffs' deputies, who had the most direct contact with the UFW's labor activities. The initial set of affidavits describes numerous instances of serious criminal conduct—primarily violent assaults—committed by agents of the growers, members of the Teamsters Union and "private security groups" against picketing UFW members in the immediate presence of, and under the observation of, the sheriffs' deputies; according to the affidavits, the deputies took no steps either to prevent such assaults or to arrest the assaulting individuals, but rather "ratified" and encouraged such conduct and, indeed, often arrested the UFW victims of such assaults. Other affidavits attest to the pervasive use of excessive force and brutality by sheriffs' deputies against nonviolent UFW members, to numerous racial slurs directed at UFW workers by law enforcement officials, to numerous instances of unjustified arrests of UFW members followed by the imposition of especially harsh and atypical conditions of confinement, and finally to several incidents of intrusive surveillance and general harassment of UFW supporters.

Defendants also filed additional affidavits relating to the alleged participation of higher-level law enforcement officers in the discriminatory enforcement scheme. One affidavit, filed by a defense counsel, described a series of meetings at which members of the district attorney's office and sheriff's office discussed with growers and their lawyers various legal stratagems for dealing with anticipated UFW labor activities; counsel attached to his affidavit several "form" injunctions which the district attorney's office had allegedly drafted for the general use of the growers against the UFW. Finally, another affidavit pointed out that on at least four occasions, the district attorney had assumed the novel role as counsel on behalf of the growers in contempt proceedings initiated against UFW members who allegedly violated outstanding civil injunctions.

As noted above, defendants submitted the foregoing affidavits not as complete proof of their discriminatory enforcement charges, but simply as evidentiary support for a discovery motion through which they sought to obtain access to a variety of material in the possession of the prosecuting authorities which, according to defendants' contentions, related to their charges of discrimination. The People filed no counter-affidavits or declarations to challenge the veracity of the numerous defense allegations, but instead took the position that, whatever the merits of defendants' charges, discovery should be denied because discriminatory enforcement could never constitute a basis for dismissing a criminal action.

After the discovery matter had been fully briefed and argued, the trial court explicitly found that the declarations submitted on behalf of the defendants established a prima facie case of discriminatory enforcement of the laws.[3] Nonetheless, the court denied defendants' discovery motion, apparently because it felt that existing California decisions did not clearly establish that a defense of discriminatory prosecution was available to the instant defendants. It is the propriety of this ruling, precluding any discovery on the issue of discriminatory enforcement, which is at issue in the instant writ proceeding.

2. *The equal protection clauses of the federal and state Constitutions safeguard individuals from "intentional and purposeful" invidious discrimination in the enforcement of all laws, including penal statutes, and a defendant may raise such a claim of discrimination as a ground for dismissal of a criminal prosecution.*

■ We begin with the established principle that in a criminal prosecution an accused is generally entitled to discover all relevant and material information in the possession of the prosecution that will assist him in the preparation and presentation of his defense. (See, e.g., *Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353]; *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 536-537 [113 Cal.Rptr. 897, 522 P.2d 305].) ■ ■■■ The point of controversy in the instant case, of course, is whether the prosecution's alleged "discriminatory enforcement of the laws" is a legally recognized "defense"[4] to the crimes with which the present defendants are charged.

---

[3]The court stated: "With regard to these discovery motions, I want to make some findings of fact so that counsel will all know where I stand, and I intend to make these findings of fact and these rulings so that all will know where they stand in these particular cases.

"With regard to the District Attorney's contention that an inference has not been made, I find that there is an inference due to the affidavits that have been filed."

[4]Although, for convenience, we shall characterize the discriminatory prosecution claim as a "defense," this terminology obscures some of the distinctive aspects of the claim. In the first place, although past California decisions have not definitively resolved the question of whether this issue should be tried to the court or to the jury (see, e.g., *People* v. *Gray* (1967) 254 Cal.App.2d 256, 264 [63 Cal.Rptr. 211]), courts in other jurisdictions have generally concluded that the issue is for resolution by the court. We agree with this determination. "The question of discriminatory prosecution relates not to the guilt or innocence of [the accused], but rather addresses itself to a constitutional defect in the institution of the prosecution." (*United States* v. *Berrigan* (3d Cir. 1973) 482 F.2d 171, 175.) As such, the claim "should not . . . be tried before the jury . . . but should be treated as an application to the court for a dismissal or quashing of the prosecution upon constitutional grounds." (*People* v. *Utica Daw's Drug Co.* (1962) 16 App.Div.2d 12 [225 N.Y.S.2d 128, 131].)

Second, because a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense, we believe the issue

Defendants contend that the equal protection clauses of our federal and state Constitutions compel the recognition of such a defense. The Fourteenth Amendment of the federal Constitution, and article I, section 7, subdivision (a) of the California Constitution prohibit all state action which denies to any person the "equal protection of the laws." In recent years, of course, the great bulk of litigation under these constitutional provisions has focused upon the propriety of classifications in statutory enactments, and in such context the judiciary has been called upon to delineate the limitations which the equal protection clauses place upon actions of the legislative branch of government. ■ This contemporary emphasis on the application of equal protection doctrine to legislation, however, should not obscure the fact that from the very inception of the Fourteenth Amendment, courts have recognized that the equal protection clause safeguards individuals from invidiously discriminatory acts of *all* branches of government, including the executive. As the United States Supreme Court declared in *Ex parte Virginia* (1880) 100 U.S. 339, 347 [25 L.Ed. 676, 679]: "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws." (See, e.g., *O'Shea* v. *Littleton* (1974) 414 U.S. 488, 502-503 [38 L.Ed.2d 674, 687-688, 94 S.Ct. 669].)

*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064] stands as the landmark decision applying the principles of the equal protection clause to the discriminatory enforcement of a law by administrative or executive officials. *Yick Wo* involved a San Francisco ordinance which prohibited any person from maintaining a laundry in a building not made of brick or stone without first obtaining a permit from the board of supervisors; violation of the ordinance constituted a misdemeanor. Two hundred and eighty persons had applied for permits under the ordinance, but, although the applicants were apparently equally qualified, the board had granted permits only to the 80

should not be resolved upon evidence submitted at trial, but instead should be raised, as defendants have done here, through a pretrial motion to dismiss. Although no clear California statutory authority provides for such a pretrial motion to dismiss, we have no doubt in light of the constitutional nature of the issue as to the trial court's authority to entertain such a claim. (Accord *Jones* v. *Superior Court* (1970) 3 Cal.3d 734, 738-739 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Coffey* (1967) 67 Cal.2d 204, 215 and fn. 11 [60 Cal.Rptr. 457, 430 P.2d 15].) To the extent that language in *People* v. *Van Randall* (1956) 140 Cal.App.2d 771, 776 [296 P.2d 68], conflicts with this conclusion, such language is disapproved.

nonChinese applicants and had denied permits to the 200 applicants who were citizens of China. When Yick Wo, one of the unsuccessful applicants, was thereafter convicted and imprisoned for maintaining a laundry without a permit, he sought a writ of habeas corpus in the United States Supreme Court.

The *Yick. Wo* court, while declining to strike down the standardless permit ordinance on its face, granted the requested writ of habeas corpus, finding that the board had impermissibly discriminated against Chinese, and that such administrative discrimination directly violated the mandate of the equal protection clause. In the course of its opinion, the court emphatically declared: "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." (118 U.S. at pp. 373-374 [30 L.Ed. at p. 227].)

In so ruling, the *Yick Wo* court gave proof that in the constitutional realm, as in most reaches of the legal domain, substance must prevail over form. An ordinance which by its explicit terms had excluded Chinese from obtaining permits to run a laundry would, of course, clearly violate equal protection principles; *Yick Wo* recognizes that individuals suffer an equal denial of constitutional right when executive officials apply a facially fair law as though the statutory language had incorporated such a specific exclusion. In each instance, selected individuals suffer a distinct deprivation at the hands of the state solely because of their ancestry; this deprivation is no less invidious when imposed by administrative design than when sanctioned by legislative mandate.

Although the People concede the authoritative nature of the *Yick Wo* decision, they contend that its rationale does not apply to the enforcement of penal laws. Relying on language in several early California Court of Appeal decisions,[5] the People argue that since no one has "a

[5] In *People* v. *Montgomery* (1941) 47 Cal.App.2d 1 [117 P.2d 437], a defendant accused of pandering claimed that he was deprived of equal protection under *Yick Wo* simply because others who had committed the same act had not been prosecuted. Instead of simply rejecting the contention as a blatant misinterpretation of *Yick Wo*, as it unquestionably was, the *Montgomery* court declared that while "[p]rotection of the law will be extended to all persons equally in the pursuit of their lawful occupations [as in *Yick Wo*] . . . no person has the right to demand protection of the law in the commission

right to commit a crime," an individual who has violated a criminal statute may not justifiably complain of the discriminatory enforcement of the law. Although obviously no one has a right to commit a crime, the People's argument misconceives the nature of the entire discriminatory enforcement problem. Just as it would have been constitutionally impermissible for San Francisco to enact an ordinance specifically barring only Chinese from obtaining laundry permits, so it would be constitutionally improper for the state to pass a statute which, for example, declared gambling a criminal offense only if committed by blacks. Because the state could not explicitly mandate criminal sanctions for gambling on such an arbitrary, invidious basis, *Yick Wo* teaches that law enforcement authorities may not enforce a facially fair gambling statute as if it was explicitly directed only at blacks. (See, e.g., *People* v. *Harris* (1960) 182 Cal.App.2d Supp. 837 [5 Cal.Rptr. 852]; *People* v. *Winters* (1959) 171 Cal.App.2d Supp. 876 [342 P.2d 538].) ■ This analysis extends to the enforcement of all penal statutes, for the equal protection clause, of course, fully applies to all criminal laws. (See, e.g., *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; *In re King* (1970) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983].)

Turning to an alternative theme expounded in the few early lower court decisions, the People assert, on ostensibly pragmatic grounds, that the *Yick Wo* principle cannot be applied to criminal prosecutions because such application "could easily lead to a rule that if some guilty persons escape, others who are apprehended should not be prosecuted." (*People* v. *Darcy, supra,* 59 Cal.App.2d 342, 353.) This contention rests entirely on a misconception of the reach of the *Yick Wo* decision and of the particularized focus of the equal protection guarantee in the administrative realm. Throughout the years, courts have uniformly recognized that administrative officials enjoy broad discretion in determining the specific circumstances under which established punitive sanctions should be invoked. ■ Contrary to the People's suggestion, the allegedly "unequal" treatment which may result from simple *laxity of enforcement* or the *nonarbitrary* selective enforcement of a statute has never been considered a denial of equal protection.

The United States Supreme Court made this point clear over 50 years ago in a case involving the application of a tax assessment provision.

---

of a crime." (47 Cal.App.2d at p. 14.) (See also *People* v. *Darcy* (1943) 59 Cal.App.2d 342, 353-354 [139 P.2d 118]; *People* v. *Sipper* (1943) 61 Cal.App.2d Supp. 844, 847-848 [142 P.2d 960]; cf. *People* v. *Flanders* (1956) 140 Cal.App.2d 765, 769-770 [296 P.2d 13]; *People* v. *Van Randall, supra,* 140 Cal.App.2d 771, 777-778.)

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. . . . It is . . . clear that mere errors of judgment by officials will not support a claim of discrimination. *There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity.*" (Italics added.) (*Sunday Lake Iron Co.* v. *Wakefield* (1918) 247 U.S. 350, 352-353 [62 L.Ed. 1154, 1155-1156, 38 S.Ct. 495].) The Supreme Court reiterated this doctrinal precept in *Snowden* v. *Hughes* (1944) 321 U.S. 1, 8 [88 L.Ed. 497, 503, 64 S.Ct. 397]: "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.*" (Italics added.)

As these authorities teach, an equal protection violation does not arise whenever officials "prosecute one and not [another] for the same act" (cf. *People* v. *Montgomery, supra,* 47 Cal.App.2d 1, 13); instead, the equal protection guarantee simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis. As the Court of Appeal succinctly stated in *City of Banning* v. *Desert Outdoor Advertising, Inc.* (1962) 209 Cal.App.2d 152, 156 [25 Cal.Rptr. 621]: "The protection afforded is against unlawful discrimination which uses law enforcement as its vehicle." As such, the doctrine imposes absolutely no impediment to legitimate law enforcement operations, for it does not insulate particular lawbreakers from prosecution, but simply requires that the authorities enforce the laws evenhandedly.

The People additionally claim, however, that even if the equal protection clause does impose limits on the exercise of prosecutorial authority, the remedy for any violation of these limits lies only in a civil suit for damages or injunctive relief and not as a defense in a criminal prosecution. The People argue in this regard that the victim of a discriminatory enforcement claim comprises only the abstract group of individuals who belong to the disfavored class; because the particular defendant has violated a criminal statute, the People argue that he should not be relieved of the consequences of his conduct simply because of the wrongful behavior of the prosecutorial officials.

This contention—in large measure simply a rephrasing of the "no right to commit a crime". argument discussed above—is, in our view, totally fallacious. ■ As we have explained, in order to establish a claim of discriminatory enforcement a defendant must demonstrate that he has been deliberately singled out for prosecution on the basis of some invidious criterion. Because the particular defendant, unlike similarly situated individuals, suffers prosecution simply as the subject of invidious discrimination, such defendant is very much the direct victim of the discriminatory enforcement practice. Under these circumstances, discriminatory prosecution becomes a compelling ground for dismissal of the criminal charge, since the prosecution would not have been pursued except for the discriminatory design of the prosecuting authorities.[6]

Indeed, if this issue of the availability of discriminatory enforcement as a defense in a criminal proceeding were ever an open one, we believe the United State Supreme Court resolved it over a decade ago in *Two Guys* v. *McGinley* (1961) 366 U.S. 582 [6 L.Ed.2d 551, 81 S.Ct. 1135]. In *Two Guys,* a large department store sought an injunction to restrain a district attorney's enforcement of a state Sunday closing law on the ground, inter alia, that the district attorney was discriminatorily enforcing the law against the store. The trial court denied the injunction, finding it unlikely that discriminatory enforcement would occur in the future. By the time the case reached the United States Supreme Court, a new district attorney had taken office and the store did not claim that the new prosecutor would discriminatorily enforce the law. The store did maintain, however, that its initial "discriminatory enforcement" claim was not moot, pointing out that numerous prosecutions against its employees, allegedly resulting from the earlier discriminatory enforcement policy, were still pending in state court.

On these facts, the Supreme Court held that the pending prosecutions did not warrant injunctive relief, basing its conclusion specifically on the

---

[6]An apt analogy can be found in several recent decisions of this court dealing with the constitutional limitations upon an administrative official's exercise of his discretion to discipline a subordinate. (See, e.g., *Adcock* v. *Board of Education* (1973) 10 Cal.3d 60 [109 Cal.Rptr. 676, 513 P.2d 900]; *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575 [100 Cal.Rptr. 16, 493 P.2d 480].) In *Bekiaris,* for example, we held that even if a teacher had committed some act which could theoretically constitute "cause" for dismissal, his dismissal would nonetheless be improper if "the true reason for the dismissal was official dissatisfaction with the teacher's exercise of constitutional rights, so that, absent the exercise of these rights, the board would not have dismissed the teacher." (6 Cal.3d at p. 593.) In like manner, if the "true reason" for a defendant's prosecution is the prosecutor's discriminatory design, "so that, absent such [invidious discrimination]" the prosecution would not have been pursued, the prosecution itself is improper and may not be maintained.

ground that the individual defendants could raise any discriminatory prosecution claim as a defense in the pending criminal proceedings. The court declared: "*Since appellant's employees may defend against any such proceeding that is actually prosecuted on the ground of unconstitutional discrimination,* we do not believe the court below was incorrect in refusing to exercise its injunctive powers . . . ." (Italics added.) (366 U.S. at pp. 588-589 [6 L.Ed.2d at p. 556].)[7] In so ruling, the court explicitly recognized both that the constitutional protection against discriminatory law enforcement applies to the enforcement of criminal statutes and that such discriminatory enforcement may be raised as a defense in the criminal proceedings themselves. Indeed this conclusion had been implicit in several of the high court's earlier decisions. (See *Edelman* v. *California* (1953) 344 U.S. 357, 359 [97 L.Ed. 387, 391, 73 S.Ct. 293]; *Ah Sin* v. *Wittman* (1905) 198 U.S. 500, 508 [49 L.Ed. 1142, 1146, 25 S.Ct. 756].)

One year after the *Two Guys* decision, the United States Supreme Court again had occasion to discuss the application of the discriminatory enforcement doctrine in relation to the application of a criminal statute. In *Oyler* v. *Boles, supra,* 368 U.S. 448, a defendant who had been convicted and sentenced under a West Virginia habitual criminal statute sought a writ of habeas corpus on the ground that the habitual criminal statute had been discriminatorily enforced against him in violation of the equal protection clause. The defendant rested his contention, however, simply on allegations that the statute under which he had been sentenced had not been applied to a great number of individuals who fit within its terms; he did not allege that he had been intentionally singled out by the prosecuting authorities on an invidiously discriminatory basis.

In rejecting the defendant's contention that his allegations demonstrated a denial of equal protection, the *Oyler* court stated: "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged." (368 U.S. at p. 456 [7 L.Ed.2d at p. 453].)

---

[7]The People seek to escape the force of this passage in *Two Guys* by characterizing the statement as mere dictum. Inasmuch as the Supreme Court's affirmance of the trial court's denial of injunctive relief was based explicitly on the availability of the discriminatory prosecution defense in the pending criminal proceedings, the quoted statement is actually a specific holding in the case.

*Oyler* thus reiterated the important distinction between "deliberate invidious discrimination" and "nonarbitrary selective enforcement" discussed above; *Oyler* makes it clear that it is only "deliberate" (i.e., "purposeful or intentional") discriminatory enforcement based upon an "unjustifiable" (i.e., "invidious") standard which is proscribed by the equal protection clause. At the same time, however, the *Oyler* decision clearly indicates that if a defendant does establish that the prosecuting authorities, in administering a statute, have followed an enforcement policy "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," a denial of equal protection will have been demonstrated, even if the statute in question is a penal law.

■ In our view, the decisions in *Two Guys* and *Oyler* establish that a criminal defendant may object, in the course of a criminal proceeding to the maintenance of the prosecution on the ground of deliberate invidious discrimination in the enforcement of the law. (See also *O'Shea* v. *Littleton, supra,* 414 U.S. 488, 502 [38 L.Ed.2d 674, 687]; *Fowler* v. *Rhode Island* (1953) 345 U.S. 67, 69-70 [97 L.Ed. 828, 830-831, 73 S.Ct. 526].)[8] In recent years, a host of federal and state decisions have uniformly entertained such claims[9] and, indeed, aside from the few aberrational

---

[8]In *Fowler,* a Jehovah's Witnesses minister was convicted under a Pawtucket city ordinance which barred any political or religious speech in a public park. On appeal in the Supreme Court, both parties focussed their legal arguments on the question of whether the ordinance was unconstitutional on its face. The court, however, found it unnecessary to reach that question for it concluded that the minister's conviction was in any event unconstitutional because the ordinance had been discriminatorily applied against Jehovah's Witnesses. Noting that the assistant attorney general had conceded at oral argument that the ordinance had been construed to permit church services by Catholics or Protestants, the court declared: "That broad concession . . . is fatal to Rhode Island's case. For it plainly shows that a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects. . . . [I]f we affirmed this conviction in the face of the concession made during oral argument Baptist, Methodist, Presbyterian, or Episcopal ministers, Catholic priests, Moslem mullahs, Buddhist monks could all preach to their congregations in Pawtucket's parks with impunity. But the hand of the law would be laid on the shoulder of a minister of this unpopular group for performing the same function." (345 U.S. at pp. 69-70 [97 L.Ed. at pp. 830-831].)

[9]See, e.g., *United States* v. *Oaks* (9th Cir. 1974) 508 F.2d 1403; *United States* v. *Berrios* (2d Cir. 1974) 501 F.2d 1207; *United States* v. *Berrigan, supra,* 482 F.2d 171; *United States* v. *Falk* (7th Cir. 1973) 479 F.2d 616; *United States* v. *Steele* (9th Cir. 1972) 461 F.2d 1148; *United States* v. *Crowthers* (4th Cir. 1972) 456 F.2d 1074; *Commonwealth* v. *Lewis* (1971) 443 Pa. 305 [279 A.2d 26, 29]; *City of Ashland* v. *Heck's, Inc.* (Ky. 1966) 407 S.W.2d 421; *People* v. *Walker* (1964) 14 N.Y.2d 901 [252 N.Y.S.2d 96, 200 N.E.2d 779]. See generally Givelber, *The Application of Equal Protection Principles to Selective Enforcement of the Criminal Law,* 1973 U.Ill.L.F. 88; Tieger, *Police Discretion and Discriminatory Enforcement,* 1971 Duke L.J. 717; Comment, *The Right to Nondiscriminatory Enforcement of State Penal Laws* (1961) 61 Colum.L.Rev. 1103.

California decisions noted above, the great majority of California authorities have similarly recognized the availability of such a defense.[10] Thus, contrary to the Attorney General's contention, the trial court's denial of discovery cannot be sustained on the broad ground that discriminatory enforcement of a penal law is *never* material in a criminal prosecution.[11]

3. *A conscious policy of selective enforcement directed against members or supporters of a particular labor organization is prima facie discriminatory and invalid under the equal protection clause.*

Having determined that as a general constitutional matter discriminatory enforcement may be invoked as a defense in a criminal action, we must consider whether defendants' present allegations are adequate to raise such a claim. ■ In the instant case, unlike so many of the prior California cases,[12] defendants' discriminatory enforcement defense does not rest simply upon allegations of laxity of enforcement; instead, defendants have clearly alleged that the Kern County law enforcement authorities undertook a practice of "intentional, purposeful and unequal enforcement of penal statutes" against the class of individuals who belong to or are associated with the UFW. We conclude that such allegations of a conscious policy of selective enforcement directed against members or supporters of a particular labor organization are clearly sufficient to support a claim of invidious discrimination which is prima facie invalid under the equal protection clause.

[10]See, e.g., *People* v. *Pearce* (1970) 8 Cal.App.3d 984, 988-989 [87 Cal.Rptr. 814]; *Powers* v. *Floersheim* (1967) 256 Cal.App.2d 223, 233-234 [63 Cal.Rptr. 913]; *People* v. *Gray, supra,* 254 Cal.App.2d 256, 263-264; *City of Banning* v. *Desert Outdoor Advertising, Inc., supra,* 209 Cal.App.2d 152, 154-156; *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 721-722 [234 P.2d 287]; *Wade* v. *City & County of San Francisco* (1947) 82 Cal.App.2d 337, 338-339 [186 P.2d 181]; *People* v. *Oreck* (1946) 74 Cal.App.2d 215, 221-222 [168 P.2d 186]; *People* v. *Harris, supra,* 182 Cal.App.2d Supp. 837, 840-842; *People* v. *Winters, supra,* 171 Cal.App.2d Supp. 876, 883-889; *People* v. *Amdur* (1954) 123 Cal.App.2d Supp. 951, 969-972 [267 P.2d 445].

[11]Insofar as they are inconsistent with this conclusion, the decisions in *People* v. *Montgomery, supra,* 47 Cal.App.2d 1, *People* v. *Darcy, supra,* 59 Cal.App.2d 342, *People* v. *Flanders, supra,* 140 Cal.App.2d 765, *People* v. *Van Randall, supra,* 140 Cal.App.2d 771, and *People* v. *Sipper, supra,* 61 Cal.App.2d Supp. 844 are disapproved.

[12]See, e.g., *In re Finn* (1960) 54 Cal.2d 807, 812-813 [8 Cal.Rptr. 741, 356 P.2d 685]; *People* v. *Vatelli* (1971) 15 Cal.App.3d 54, 59 [92 Cal.Rptr. 763]; *City of Banning* v. *Desert Outdoor Advertising, Inc., supra,* 209 Cal.App.2d 152, 155; *People* v. *Pope* (1959) 168 Cal.App.2d 666, 668-669 [366 P.2d 236]; *People* v. *Gordon, supra,* 105 Cal.App.2d 711, 721-722; *People* v. *Hess* (1951) 104 Cal.App.2d 642, 685 [234 P.2d 65]; *People* v. *Montgomery, supra,* 47 Cal.App.2d 1, 13-14.

As we have noted, in *Oyler* v. *Boles, supra,* 368 U.S. 448, 456 [7 L.Ed.2d 446, 453], the United States Supreme Court explained that a denial of equal protection would be established if a defendant demonstrates that the prosecutorial authorities' selective enforcement decision "was deliberately based upon an unjustifiable standard such as race, religion, *or other arbitrary classification.*" (Italics added.) In the instant case we have no occasion to consider the entire range of classifications that may be "arbitrary" in this context, i.e., that bear no rational relationship to legitimate law enforcement interests, but need determine only whether a selective enforcement policy based upon membership in a particular labor organization is presumptively unjustifiable.

Numerous decisions of both the United States Supreme Court and this court attest to the constitutionally enshrined status of an individual's right to associate with others for the purpose of publicizing grievances and peacefully pressing for mutually beneficial changes. (See, e.g., *Railroad Trainmen* v. *Virginia Bar* (1964) 377 U.S. 1, 5-6 [12 L.Ed.2d 89, 92-93, 84 S.Ct. 1113]; *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 460 [2 L.Ed.2d 1488, 1498, 78 S.Ct. 1163].) In the labor field, of course, this general constitutional concern is reflected in numerous specific statutory provisions affording workers the "full freedom of association [and] self-organization." (See, e.g., Lab. Code, § 923; 29 U.S.C. § 157.) In light of the constitutional and statutory foundations of workers' freedom of association, we have no doubt that an administrative policy which singles out individuals for prosecution on the basis of their exercise of the right to join the union of their choice is, at least presumptively, unjustifiable and invidious. (See *Medrano* v. *Allee* (S.D.Tex. 1972) 347 F.Supp. 605, 613-614, 619-620, affd. (1974) 416 U.S. 802, 808 [40 L.Ed.2d 566, 576, 94 S.Ct. 2191].)[13] As the Seventh Circuit recently observed in a similar discriminatory prosecution context: "[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government." (*United States* v. *Falk, supra,* 479 F.2d 616, 620; see, e.g., *United States* v. *Steele,*

---

[13] In the labor field, the danger of such a discriminatory practice is not only that governmental authorities will use law enforcement as a weapon against politically disfavored organizations, but additionally that local law enforcement officials will use the leverage of their official power to favor one of a number of competing labor organizations, in direct contravention of the general state policy of governmental neutrality in internecine labor disputes. (See, e.g., *Englund* v. *Chavez* (1972) 8 Cal.3d 572, 584-585 [105 Cal.Rptr. 521, 504 P.2d 457]; cf. *Allee* v. *Medrano, supra,* 416 U.S. 802, 808.)

*supra*, 461 F.2d 1148, 1151; *United States* v. *Crowthers*, *supra*, 456 F.2d 1074, 1079.[14]

Accordingly, defendants' allegations of an intentional, purposeful selective enforcement policy directed against members and supporters of the UFW clearly raise a substantial discriminatory enforcement claim. Indeed, the People do not even seriously contend that governmental authorities may single out individuals for prosecution on the basis of their union affiliation. Consequently, the trial court's denial of discovery cannot be sustained on the ground that defendants have failed adequately to allege a practice of invidious discrimination.

4. *Neither the alleged "serious" nature of the present charges, nor the multiplicity of penal statutes in question, invalidates defendants' discriminatory prosecution claim.*

The People maintain, however, that the denial of discovery may be justified by the nature of the criminal conduct at issue here, arguing that all of the misdemeanors charged in the instant case—ranging from driving without a license in one's possession to reckless driving—are "too serious" to permit a discriminatory prosecution defense. ▪▪ With the exception of one isolated statement, in dictum, in one of the early, erroneous lower court decisions noted above,[15] however, there is absolutely no support in any of the numerous discriminatory prosecution cases for the notion that the equal protection clause is inapplicable to the enforcement of "serious" criminal statutes.

As we have explained, the constitutional mandate prohibits administrative officials from utilizing their law enforcement discretion as a vehicle for intentional invidious discrimination; that prohibition applies

---

[14]Although a selective enforcement policy based on organizational association is presumptively suspect, prosecutorial authorities may well be able to justify such a selective enforcement policy when the "organization" in question is itself involved in perpetrating criminal activities. Under such circumstances, legitimate law enforcement interests may justify a policy which concentrates enforcement operations on the conduct of members of a particular "gang" of lawbreakers. By demonstrating the criminal proclivities of the organization involved in such a case, the People may rebut any inference that its selective enforcement policy rests on an invidious basis.

[15]In *People* v. *Montgomery*, *supra*, 47 Cal.App.2d 1, 14, the Court of Appeal suggested in dictum that "the only possible application of the doctrine of the *Yick Wo* case to a criminal prosecution would appear to be in an instance where a person was under prosecution for the commission of some otherwise harmless act which ordinarily had not theretofore been treated as a crime." This dictum has been criticized in the academic literature. (See, e.g., Comment, *The Right to Nondiscriminatory Enforcement of State Penal Laws* (1961) 61 Colum.L.Rev. 1103, 1111 & fn. 41.)

to the misuse of *any* criminal law. The fact that most claims of discriminatory enforcement to date have involved relatively minor crimes reflects no more than that law enforcement officials generally prosecute without discrimination serious criminal offenders; a defendant charged with murder, for example, would obviously find it extremely difficult to demonstrate that, but for a law enforcement officer's discrimination or bias, he would not have been prosecuted for his criminal act. In the few cases in which discriminatory enforcement has been claimed with respect to serious criminal statutes, the courts have not rejected the claim because the prosecution could contend that the criminal conduct involved was "serious." (See, e.g., *Oyler* v. *Boles, supra,* 368 U.S. 448, 456 (enforcement of habitual criminal statute).)

Invoking the language of numerous recent equal protection cases, the People alternatively suggest that the state's "compelling" interest in prosecuting those who commit serious crimes renders the discriminatory enforcement doctrine inapplicable to such serious offenses. This position rests on a fundamental misunderstanding of the "compelling interest" analysis. Although the state unquestionably has a compelling interest in prosecuting serious criminal conduct, that interest is not related to and does not justify the *discriminatory enforcement* of criminal statutes. To fall within the rationale of the recent equal protection cases, the People must demonstrate that they have a compelling interest that necessitates the discriminatory enforcement of serious criminal statutes (see *McLaughlin* v. *Florida* (1964) 379 U.S. 184, 193-194 [13 L.Ed.2d 222, 229-230, 85 S.Ct. 283]; *In re King, supra,* 3 Cal.3d 226, 233); in other words, the People would be required to show the necessity of singling out for discriminatory treatment only a portion of those who commit serious crimes. Nothing in the present record would support any such contention.

■ Finally, the People point to an additional aspect of the present claim of discriminatory prosecution in an attempt to justify the trial court's refusal to sanction discovery. The six defendants before us face prosecution on a variety of misdemeanor charges and have urged the discriminatory prosecution defense with respect to each of the various charges. In past cases involving allegations of discriminatory enforcement, by contrast, the defendant's claim has almost invariably been directed at the prosecution's alleged selective enforcement of a single penal provision. We conclude, however, that this variation also affords no justification for the trial court's denial of discovery.

As we have explained, the principal objective of the equal protection guarantee with respect to administrative enforcement of statutes is to safeguard individuals from administrative officials who utilize their discretionary powers of selective enforcement as a vehicle for intentional invidious discrimination. Such discriminatory law enforcement conduct poses as significant a denial of equal protection if officials misuse a variety of statutory enactments as if officials abuse only a single provision. Thus, the breadth of the prosecutorial policy allegedly pursued in the instant case provides no immunity to the prosecutors.

We emphasize that, in the present proceeding, we are not faced with the question of whether defendants' showing is adequate to rebut the presumption that official duty has been properly, and hence constitutionally, exercised (see Evid. Code, §§ 664, 606; *People* v. *Gray, supra,* 254 Cal.App.2d 256, 265); the only issue before us is whether discovery on the discriminatory prosecution claim should have been totally foreclosed. At this stage of the proceedings, it is impossible to determine what evidence defendants will ultimately proffer in support of their claim; the discovery motions before us seek to uncover both direct evidence of purposeful, discriminatory conduct[16] as well as circumstantial evidence which might be relevant in raising an inference of such purposeful invidious discrimination.[17] ▪▪▪ Under these circumstances, we believe the trial court erred in totally denying discovery with respect to defendants' equal protection claim. Consequently, we conclude that the challenged order should be vacated.[18]

---

[16]For example, defendants seek copies of (1) any district attorney or sheriff interdepartmental memoranda related to the "UFW and/or the Teamsters Union," (2) correspondence between the District Attorney and/or Sheriff of Kern County and officials of the Teamsters Union or growers engaged in a labor dispute with the UFW, and (3) minutes of meetings held by the district attorney or sheriff's department "where the subject of discussion was the enforcement or non-enforcement of any law involving members of the Teamsters Union, UFW union and/or individuals associated with growers engaged in labor disputes with the UFW." Although defendants have not demonstrated that there actually are such documents in the prosecutor's possession, as we stated recently in *Hill* v. *Superior Court, supra,* 10 Cal.3d 812, 817, "proof of the existence of the item sought is not required."

[17]In the course of argument on the discovery motion, defense counsel explained that defendants would seek to prove that the criminal contempt statute (Pen. Code, § 166, subd. 4) was rarely invoked in connection with alleged violations of civil injunctions and that the Kern County officials discriminatorily enforced the section against UFW members. In this regard, defendant's discovery motion seeks statistical data with respect to all arrests and prosecutions under the civil contempt provisions initiated by Kern County officials in 1972 and 1973.

[18]Because the trial court ruled that no discovery with respect to the discriminatory enforcement issue was proper, it did not pass upon the discoverability of the specific items requested, nor on the propriety, or permissible scope, of any oral examination of

## 5. Conclusion

The instant case involves the narrow issue of whether the trial court properly foreclosed discovery with respect to defendants' claim of discriminatory prosecution. As we have explained, decisions of the United States Supreme Court explicitly recognize that a criminal defendant may defend a criminal prosecution on the ground that he has been the subject of such "intentional and purposeful" invidious discrimination. In light of the materiality of this defense, traditional principles of criminal discovery mandate that defendants be permitted to discover information relevant to such a claim. Accordingly, the trial court erred in barring all access to such information in the possession of the prosecution.

Let a peremptory writ of mandate issue, directing the trial court to vacate its order denying discovery and to proceed in accordance with the views expressed herein.

Wright, C. J., Mosk, J., and Sullivan, J., concurred.

RICHARDSON, J.—I concur in the judgment. While expressing serious reservations about the reach of the defense of discriminatory prosecution, I agree with the majority that the defense should be available to those very limited numbers of persons described in the opinion, namely, defendants who can establish that they would not otherwise have been prosecuted but for such discriminatory conduct. (*Ante,* at p. 298.) A serious offender, and the vast majority of offenders generally, would find it "extremely difficult" to make such a showing. (*Ante,* at pp. 303-304.)

McComb, J., and Clark, J., concurred.

The petition of the real party in interest for a rehearing was denied October 23, 1975.

---

specific law enforcement officers. On remand, the People will be free to raise any objections to the specific information sought, including a claim of privilege for "official information" (see Evid. Code, § 1040); the trial court should, of course, resolve all such objections before compelling discovery. (See *Pitchess* v. *Superior Court, supra,* 11 Cal.3d pp. 538, 540; cf. *United States* v. *Oaks, supra,* 508 F.2d 1403, 1405; *United States* v. *Berrios, supra,* 501 F.2d 1207, 1212-1213.)