Filed 5/26/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CLEMON YOUNG, JR.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF<br>SOLANO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | A162850<br><br>(Solano County<br>Super. Ct. No. FCR347170) |

## I.  INTRODUCTION

Under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (the Racial Justice Act or the Act), "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin."  (Pen. Code,[1] § 745, subd. (a).)  We are called upon in this writ proceeding to address as a matter of first impression the discovery provision of the Racial Justice Act, which allows a defendant, "[u]pon a showing of good cause," to obtain evidence from the prosecution relevant to a potential violation of the Act.  (§ 745, subd. (d).)

---

[1] All further undesignated statutory references are to the Penal Code.

1

Based on evidence presented at his preliminary hearing, Young argued below that racial profiling in a traffic stop led to his arrest for the offense of possession of Ecstasy for sale. He also pointed to publicly available statistics showing that, statewide, blacks are more likely to be searched during the course of traffic stops than other citizens. On this showing, he brought a motion under the Racial Justice Act seeking discovery relating to charging decisions in cases he claims are comparable to his. For the past five years, he sought the names and case numbers of others who were charged with or could have been charged with possession of Ecstasy for sale; the same information for a broad range of related drug offenses; the police reports relating to the suspects involved and their criminal histories; and the dispositions in all of these cases. Upon compelled disclosure of this information, Young wishes to show that the District Attorney "has more frequently charged Black defendants like Mr. Young, Jr. with possession for sale" than defendants of other races. (See § 745, subd. (a)(3).)

Proceeding cautiously and noting the lack of available appellate precedent to guide its application of section 745, subdivision (d), the trial court denied the motion. The court's only articulated reason for the denial was that Young's good cause showing appeared to rest on nothing more than his race. Before us, on writ review, the Attorney General reiterates this rationale, though in slightly different form. He argues that, as a matter of statutory interpretation, since Young's race is the only "logical link" between, on the one hand, the allegation of racial profiling (a charge he claims is pertinent to whether there was a violation of section 745, subdivision (a)(1)), and on the other hand, the allegation of racially biased prosecution (a charge he claims is pertinent to whether there was a violation of section 745,

2

subdivision (a)(3)), good cause for discovery relating to prosecutorial bias is lacking.

We will disagree, vacate the denial order, and remand with directions. The trial court's reason for denying Young's motion was incorrect as a factual matter. The grounds for the motion went beyond "simply" Young's race, and the Attorney General's reformulation of that mistaken premise, to the extent his "logical link" argument has any bearing on good cause, goes to the breadth and scope of allowable discovery, not to whether discovery should be allowed at all. Borrowing from the minimal threshold showing that is required to trigger an obligation to provide so-called *Pitchess* discovery (Evid. Code, § 1043, subd. (b); see *Pitchess v. Superior Court* (1974) 11 Cal.3d 531), we hold that Young may claim entitlement to discovery under section 745, subdivision (d) if he makes a plausible case, based on specific facts, that any of the four enumerated violations of section 745, subdivision (a) could or might have occurred. (§ 745, subd. (a)(1)–(4).)

But a showing of plausible justification is merely a threshold consideration. "The trial court, in deciding whether the defendant shall be permitted to obtain discovery of the requested material, must consider and balance a number of [other] factors" (*City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134 (*Alhambra*)), "[s]pecifically . . . (1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant has acted in a timely manner, (5) whether the time required to produce the requested

3

information will necessitate an unreasonable delay of defendant's trial, [and] (6) whether the production of the records containing the requested information would place an unreasonable burden on the governmental entity involved" (*ibid.*, fn. omitted).

Whether Young can satisfy this multifactor test of good cause remains to be seen. We decline his invitation to reverse outright and issue a writ directing the entry of an order granting his discovery requests as framed. Instead, we vacate the order denying discovery and direct the trial court to give Young's motion further consideration. While we provide some general guidance, we leave to the trial court the specific application of the plausible justification standard we adopt here, taking other pertinent factors into account. Described broadly, the court's task will be to engage in a discretionary weighing of the strength of Young's factual showing, the potential probative value of the information he seeks, and the burdens of gathering the requested "records or information" for disclosure. (§ 745, subd. (d).) Should the court conclude that discovery is warranted, we can say no more at this point than that the scope of compelled discovery must be tailored to demonstrated need.

## II. BACKGROUND

### A. *Young's Discovery Request*

In August 2019, the People filed a felony complaint charging Young with possession of a controlled substance (Ecstasy) for sale (Health & Saf. Code, § 11378).

In May 2021, Young filed a motion to "compel disclosure of relevant data" pursuant to the Racial Justice Act. The motion sought disclosures relevant to whether the People's decision to charge him with felony possession of a controlled substance was based on his race in violation of

4

section 745, subdivision (a)(3) of the Racial Justice Act. Specifically, it requested the following categories of information:

"1. The name and case number of every individual against whom charges for a violation of Health and Safety Code 11378, 11379, 11377, and 11350 have been filed in the last five years from January 1, 2016 to March 17, 2021 or the date of receipt of this request, whichever is later.

"2. The police reports that form the basis of all of the charges in all of those cases.

"3. The disposition if any of all of the cases.

"4. The name and case number of every individual against whom the district attorney declined to prosecute for any of the above-listed Health and Safety Code violations.

"5. The name and case number of every sentencing that occurred for a violation of one of the above-listed Health and Safety Codes, whether or not joined with other charges, from the period between January 1, 2016 and March 17, 2017, or the date of receipt of this request, whichever is later.

"6. The criminal history of every defendant for whom the district attorney provides the above-requested data."

In order to establish good cause for this information, Young cited statewide data showing that black drivers are more likely than drivers of other races to be subject to a police traffic stop and vehicle search. Young also pointed to the circumstances of the traffic stop leading to his arrest, which, according to him, had the hallmarks of racial profiling—a pretextual traffic stop for an infraction, the use of excessive, unprovoked force, and a search of his entire car.

Centering his discovery motion on alleged racial profiling in connection with his arrest, Young argued that his subsequent prosecution was likely

5

tainted by racial discrimination as well. The Solano County District Attorney opposed the motion, arguing there was no showing of good cause for the requested disclosures. The district attorney claimed that the treatment of black motorists in general by law enforcement has no bearing on the charging decision in Young's case. According to the district attorney, Young bore the burden of showing that prosecutorial discretion was exercised with intentional and invidious discrimination in his particular case, and no such showing was made.

The trial court denied Young's motion. The court explained it was "not comfortable with making this requirement in this situation because there's so little guidance, and it's unclear whether or not there needs to be any other information other than simply the race of your client to require it. [¶] I'm doing that in part because maybe we'll get some, maybe this case will lead to us getting some, if you want to appeal my decision in some way. I'm happy to get further guidance because it is not clear to me what simply indicates, where you have the race of the defendants being the only reason we get into a consideration request under Penal Code Section 745."

Young filed a petition for writ of prohibition asking us to vacate the order denying discovery and restrain the court from proceeding further until it enters a new and different order granting his discovery motion.[2] We

_____

[2] A writ of prohibition issues to restrain further action by a tribunal that is acting in excess of its jurisdiction. (Code Civ. Proc., § 1102.) A writ of mandate issues to correct an abuse of discretion or to compel the performance of a ministerial duty. (Code Civ. Proc., § 1085.) The two forms of writ relief are often confused. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 15:30.) We will construe Young's writ as one seeking mandate relief. (See *Rio Del Mar Country Club v. Superior Court* (1948) 84 Cal.App.2d 214, 217 ["if mandate is the proper remedy the petitioner will not be denied relief because of the erroneous choice of remedies"].)

6

received preliminary briefing and issued an order to show cause. The Attorney General filed a formal return. Amici curiae briefs were submitted in support of Young by the Office of the State Public Defender, by Assemblymember Ash Kalra (who sponsored the Racial Justice Act), and jointly by the American Civil Liberties Union of Northern California and the Equal Justice Society.

## B. *The Racial Justice Act*

Effective January 1, 2021, the Racial Justice Act, which is codified in a scheme of interrelated statutes in the Penal Code (§§ 745, 1473, subd. (f), 1473.7, subd.(a)(3)), states that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The command is simple, but the implementation is somewhat complex.

The Act sets forth four categories of conduct, any of which, if proved, is enough to "establish" a violation of section 745, subdivision (a). Two of these categories of conduct are most pertinent here. They occur when "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" (§ 745, subd. (a)(1)), or when "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who commit similar offenses and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the

7

convictions were sought or obtained" (§ 745, subd. (a)(3)).[3] The other two categories of conduct, not implicated in this case but worth mentioning to illustrate the breadth of the Act, concern conduct at trial or in sentencing.[4]

Procedurally, the Act authorizes defendants to seek relief for a violation of section 745, subdivision (a), prior to imposition of judgment, by "motion . . . in the trial court." (§ 745, subd. (c).) If such a motion is brought, the court shall, upon a showing of a prima facie violation of section 745, subdivision (a), hold a hearing at which "evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses"; the court may appoint an independent expert; and the defendant shall bear the burden of proof of a violation of section 745, subdivision (a) by a preponderance of the evidence. (§ 745, subd. (c).) At the conclusion of the hearing, "the court shall make

---

[3] Under section 745, subdivision (h)(1), " 'More frequently sought or obtained' or 'more frequently imposed' means that statistical evidence or aggregate data demonstrate a significant difference in seeking or obtaining convictions or in imposing sentences comparing individuals who have committed similar offenses and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity."

[4] See section 745, subdivision (a)(2) ("During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful"); section 745, subdivision (a)(4) ("A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed.").

findings on the record." (*Ibid*.)  And if a violation of section 745, subdivision (a) is proved, "the court shall impose a remedy specific to the violation found from the following list" (§ 745, subd. (e)):  declaration of a mistrial, discharge of the jury and empanelment of a new jury; or dismissal of enhancements, special circumstance allegations, or other special allegations; or reduction of one or more charges.  (§ 745, subd. (e)(1)(A)–(C).)  Claimed violations of section 745, subdivision (a) may also be raised postjudgment, by petition for habeas corpus under section 1473, subdivision (f) or by motion to vacate an allegedly invalid conviction or sentence under section 1473.7.  The Act authorizes a set of remedies specific to postjudgment requests for relief.  (§ 745, subd. (e)(2)(A)–(B).)

Specifically at issue here is the discovery provision of the Racial Justice Act, section 745, subdivision (d), which provides:  "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state.  A motion filed under this section shall describe the type of records or information the defendant seeks."  "Upon a showing of good cause, the court shall order the records to be released.  Upon a showing of good cause, and if the records are not privileged, the court may permit the prosecution to redact information prior to disclosure."  (*Ibid*.)

C. *Legislative Findings and Legal Landscape Prior to the Act*
   1. **Legislative Rejection of Prevailing Law**

Accompanying the Racial Justice Act is a set of uncodified findings that comment extensively on the state of the law at the time the Act was passed.  Without endorsing the accuracy of these findings to the extent they set forth and are premised on a particular reading of the law, we summarize them

9

here, for they provide an illuminating guide to the legislative objectives in passing the Act.

The findings explain that "[e]ven though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms. . . . Even when racism clearly infects a criminal proceeding, under current legal precedent, proof of purposeful discrimination is often required, but nearly impossible to establish." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (c) (Assembly Bill 2542).) "Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (Assem. Bill 2542, § 2, subd. (i).)

Even when presented with direct evidence of racial animus, the Legislature finds, courts sometimes do not recognize conduct as racially discriminatory despite tell-tale signs that it rests on stereotypical or derogatory thinking. (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subd. (d).) Citing various examples drawn from case law to illustrate what it perceives as judicial reticence in dealing with claimed race discrimination (Assem. Bill 2542, § 2, subds. (d)–(f)),[5] the Legislature concludes that "[c]urrent law, as

___

[5] Most of these examples are from federal cases, but some California cases are cited as well. The Legislature finds that (1) "Existing precedent countenances racially biased testimony, including expert testimony, and arguments in criminal trials" (citing *U.S. v. Shah* (9th Cir. 2019), 768 Fed.Appx. 637, 640); (2) "Existing precedent has provided no recourse for a defendant whose own attorney harbors racial animus towards the defendant's racial group, or toward the defendant, even where the attorney routinely used racist language and 'harbor[ed] deep and utter contempt' for

10

interpreted by the courts, stands in sharp contrast" to the Legislature's strong commitment to root out discrimination in the criminal justice system and runs contrary to the Legislature's declared acknowledgement that "all persons possess implicit biases . . . , that these biases impact the criminal justice system . . . , and that negative implicit biases tend to disfavor people of color." (Assem. Bill 2542, § 2, subd. (g).)

Stating its intent to depart from the discriminatory purpose paradigm in federal equal protection law (e.g., *McCleskey v. Kemp* (1987) 481 U.S. 279, 292 (*McCleskey*) [statistical showing that race likely influenced imposition of death penalty held insufficient to warrant reversal because "to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose"]; *Batson v. Kentucky* (1986) 476 U.S. 79, 93 ["the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose' "]; see *Washington v. Davis* (1976) 426 U.S. 229, 240), the Legislature declares an objective "to reject the conclusion that racial disparities within our criminal justice system are inevitable, and to actively work to eradicate them." (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subd. (i).)

---

the defendant's racial group" (citing *Mayfield v. Woodford* (9th Cir. 2001) 270 F.3d 915, 924–925 (en banc)); (3) "Existing precedent holds that appellate courts must defer to the rulings of judges who make racially biased comments during jury selection" (citing *People v. Williams* (2013) 56 Cal.4th 630, 652); and (4) "Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials" (citing *Duncan v. Ornoski* (9th Cir. 2008) 286 Fed.Appx. 361, 363 and *People v. Powell* (2018) 6 Cal.5th 136, 182–183). (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subds. (d)–(e).)

11

On these foundational findings, the Legislature states an intent to purge racial discrimination from our criminal justice system by taking proactive steps designed to "ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subd. (i).) Toward that end, the Racial Justice Act provides a set of remedies designed to "eliminate racially discriminatory practices in the criminal justice system." (Assem. Bill 2542, § 2, subd. (j).) What the Legislature has to say about the specific feature of the Act that is at issue here—the discovery provision—is, of course, particularly notable. The Legislature explains that it wishes to "ensure" that defendants claiming a violation of section 745, subdivision (a), have "access to all relevant evidence, including statistical evidence, regarding potential discrimination in seeking or obtaining convictions or imposing sentences." (Assem. Bill 2542, § 2, subd. (j).)

### 2. *McCleskey v. Kemp*

The legislative findings cite *McCleskey*, *supra*, 481 U.S. 279, as the prime example that "[e]xisting [judicial] precedent . . . accepts racial disparities in our criminal justice system as inevitable." (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subd. (f).) Because the findings highlight *McCleskey* as an emblem of perceived judicial indifference to racial bias, a review of that case will provide some insight into what, exactly, the Legislature rejected in enacting this new approach to rooting out racial discrimination in the criminal justice system.

In *McCleskey*, a death penalty case, habeas petitioner Warren McCleskey challenged his conviction and sentence on Eighth and Fourteenth Amendment grounds, arguing that statistical evidence showed defendants in Georgia who killed white victims were 4.3 times more likely to receive the death penalty than defendants charged with killing blacks. (*McCleskey*,

*supra*, 481 U.S. at p. 287.)  He relied on the findings of a statistics expert, Professor David Baldus, who examined 2,000 murder cases throughout the state of Georgia and performed a multiple regression analysis that excluded 230 nonracial explanations for the discriminatory pattern his study confirmed.  (*Id*. at pp. 286–288.)  The Baldus study showed that prosecutors were most likely to seek the death penalty in a case involving a white victim.  Specifically, Georgia prosecutors requested the death penalty in 70 percent of cases involving black defendants and white victims; 32 percent of cases involving white defendants and white victims; 15 percent of cases involving black defendants and black victims; and 19 percent of cases involving white defendants and black victims.  (*Id*. at p. 287.)  And racial factors were most likely to play a role in capital sentencing in cases that presented the greatest degree of jury discretion.  (*Id*. at p. 287, fn. 5.)

The high court accepted the validity of Baldus's findings (*McCleskey*, *supra*, 481 U.S. at p. 291, fn. 7), but characterized them as evidencing nothing more than a "discrepancy that appears to correlate with race" (*id*. at p. 312).  Pointing to the absence of evidence that the State of Georgia enacted its death penalty statute with a racially discriminatory purpose, the court, by a 5–4 vote, declined to find a constitutional defect.  (*Id*. at pp. 292–296, 298–299.)  The court observed that discretion—as exercised by prosecutors as well as by juries—can work in a defendant's favor as well as against him (*id*. at p. 312 [" 'the power to be lenient [also] is the power to discriminate' "]), and explained that the jury is a criminal defendant's fundamental bulwark against " 'race or color prejudice' " (*id*. at p. 310).  The court also pointed to *Batson v. Kentucky*, *supra*, 476 U.S. 79—notably, another focus of our

13

Legislature's criticism in passing the Racial Justice Act[6]—to show its own " 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." (*McCleskey*, *supra*, 481 U.S. at p. 309.) Taking Warren McCleskey's statistical approach to proving racial discrimination to the full measure of its logic, the court explained, "other claims could apply with equally logical force to statistical disparities that correlate with the race or sex of other actors in the criminal justice system." (*Id*. at p. 317.) These kinds of statistics-based arguments were "best presented to the legislative bodies," the court decided. (*Id*. at p. 319.)

Justice Brennan, in dissent, opined that "[t]he statistical evidence in this case . . . relentlessly documents the risk that McCleskey's sentence was influenced by racial considerations." (*McCleskey*, *supra*, 481 U.S. at p. 328 (dis. opn.).) As Justice Brennan saw it, "This evidence shows that there is a better than even chance in Georgia that race will influence the decision to impose the death penalty: a majority of defendants in white-victim crimes would not have been sentenced to die if their victims had been black." (*Ibid*.) Given the history of officially sanctioned racial bias in Georgia's criminal justice system, Justice Brennan argued that McCleskey's statistics could not be ignored. (*Id*. at pp. 332–334 (dis. opn.).) What the majority characterized as " 'unceasing efforts' " to "eradicate" racial discrimination in the criminal justice system (*McCleskey*, at p. 309), Justice Brennan saw as "honorable

_____

[6] See Assembly Bill 2542 (2019–2020 Reg. Sess.) section 2, subdivision (c) citing various judicial opinions criticizing the effectiveness of *Batson* in combatting racially discriminatory use of peremptory challenges in jury selection, including *People v. Bryant* (2019) 40 Cal.App.5th 525, 544 (conc. opn. of Humes, P. J.) ("there are good reasons to question whether" the anti-discrimination protections of *Batson*/*Wheeler* in jury selection are being realized because proof of "purposeful discrimination sets a high standard that is difficult to prove in any context").

14

steps" but merely evidence of the persistence of the underlying problem (*id.* at pp. 333, 344 (dis. opn.)).  In a rejoinder quoted by the Legislature in its findings accompanying the Racial Justice Act, Justice Brennan observed that the majority's "fear . . . McCleskey's claim would open the door to widespread challenges to all aspects of criminal sentencing" suggested a "fear of too much justice."  (*Id.* at p. 339 (dis. opn.).)[7]

There is little doubt which side of the *McCleskey* debate our Legislature has aligned California with by statute.  More than three decades after *McCleskey* was decided, the Legislature took up the high court's invitation to fashion a response to the intractable problem that Justice Brennan identified.  In the Racial Justice Act, it enacted a statutory scheme applicable in all criminal and juvenile delinquency cases that not only eliminates any requirement to show discriminatory purpose (§ 745, subds. (a)(2), (f)) and

_____

[7] The Legislature's critique of *McCleskey* and embrace of Justice Brennan's dissent is not something new.  The *McCleskey* decision and its rationale continue to be debated many years after it was handed down, with many critics weighing in on the side of the dissent.  (See Kennedy, *McCleskey v. Kemp: Race, Capital Punishment, and the Supreme Court* (1988) 101 Harv. L.Rev. 1388, 1388–1389 ["The Court's decision in *McCleskey v. Kemp* was immediately beset by sharp criticism and, in some instances, outright denunciation.  Anthony Lewis charged that the Court had 'effectively condoned the expression of racism in a profound aspect of our law.'  Hugo Bedau likened the decision to such notorious holdings as *Dred Scott v. Sandford*, *Plessy v. Ferguson*, and *Korematsu v. United States*.  The *Harvard Law Review* described the *McCleskey* decision as 'logically unsound, morally reprehensible, and legally unsupportable.' "]; see also Sundby, *The Loss of Constitutional Faith: McCleskey v. Kemp and the Dark Side of Procedure* (2012) 10 Ohio St. J.Crim.L. 5, 29.)  Even the author of the court's opinion, Justice Powell, had regrets about it.  After his retirement from the high court, Justice Powell was asked by his biographer if there was one case in which he would change his vote if he had the opportunity.  His reply: "Yes, *McCleskey v. Kemp*."  (Jefferies, Jr., Justice Lewis F. Powell, Jr. (1994) p. 451.)

permits violations of the Act to be established based on statistics (§ 745, subds. (c)(1), (h)(1)), but also appears to be a direct response to the result reached in *McCleskey*, since it includes among its panoply of new remedies the provision that "[w]hen the court finds there has been a violation of [section 745] subdivision (a), the defendant shall not be eligible for the death penalty." (§ 745, subd. (e)(3).)

### 3. *United States v. Armstrong*

While any number of statutory interpretation questions may arise in the future as to the reach and application of the Racial Justice Act, in this case we address only a question of discovery procedure: What showing must a defendant make in order to be entitled to discovery upon an allegation of racially discriminatory charging? A similar question no doubt arose early in Warren McCleskey's habeas proceedings, given the presence in the extensive record assembled there of information that could only have been obtained from prosecutors through compelled discovery. (See, e.g., *McCleskey*, *supra*, 481 U.S. at p. 360, fn. 13 (dis. opn. of Blackman, J.) ["As a result of McCleskey's discovery efforts, the record . . . contains relevant testimonial evidence by two state officials."].)

It turns out that, even before *McCleskey* was decided, there were cases addressing this very question in federal law.[8] Synthesizing the threshold standard defendants must meet in order to be entitled to discovery in cases alleging selective prosecution, *United States v. Armstrong* (1996) 517 U.S.

---

[8] See *United States v. Greenwood* (4th Cir. 1986) 796 F.2d 49, 52–53; *United States v. Mitchell* (7th Cir. 1985) 778 F.2d 1271, 1277; *United States v. Berrios* (2d Cir. 1974) 501 F.2d 1207, 1211 (*Berrios*); see also *United States v. Parham* (8th Cir. 1994) 16 F.3d 844, 846–847; *United States v. Fares* (2d Cir. 1992) 978 F.2d 52, 59–60; *United States v. Peete* (6th Cir. 1990) 919 F.2d 1168, 1176; *C.E. Carlson, Inc. v. Securities and Exchange Commission* (10th Cir. 1988) 859 F.2d 1429, 1437–1438.

456 (*Armstrong*) was the leading case at the time the Racial Justice Act was passed and remains the leading case today. Because the discovery question *Armstrong* addresses is identical to the question we address in this case, albeit where discrimination is claimed under the equal protection clause, *Armstrong*'s holding and its reasoning establish a specific point of departure—just as *McCleskey* is a point of departure more generally—when we consider what the Legislature likely intended when it enacted the "good cause" standard in section 745, subdivision (d).

In *Armstrong*, five black defendants were federally charged with conspiracy to distribute crack cocaine, exposing them to mandatory minimum sentences far higher than those applicable for the same offense prosecuted in state court. (*Armstrong*, *supra*, 517 U.S. at pp. 458–460.) Arguing that black defendants were being targeted for federal prosecution, they presented a study showing that, in a single year, of all cases involving crack offenses closed by the Federal Public Defender's Office in the Central District of California where they were charged, 24 out of 24 cases involved black defendants. (*Id*. at p. 459.) They also presented a defense lawyer's affidavit stating that, in his experience in that district, crack cases against non-blacks were regularly prosecuted in state court, and a drug treatment counselor's affidavit that the population of crack users he treated was composed of just as many whites as minorities. (*Id*. at p. 460.) The district court granted a discovery order, and a divided Ninth Circuit panel affirmed. (*U.S. v. Armstrong* (9th Cir. 1995) (en banc) 48 F.3d 1508, 1510, revd. (1996) 517 U.S. 456.)

Reversing, the high court held that no discovery was warranted. (*Armstrong*, *supra*, 517 U.S. at p. 458.) It first addressed Federal Rule of Civil Procedure 16, the rule governing discovery generally in federal criminal

17

cases. Because an allegation of selective prosecution does not affirmatively defend against the Government's case-in-chief, the court held a request for discovery in support of such a claim is not "material" to a defense under former Federal Rule of Civil Procedure 16(a)(1)(C). (*Armstrong*, at pp. 461–463.) In the absence of authorization for the requested discovery by rule, the court assumed (without directly deciding) that where defendants argue invidious discrimination based on a theory of selective prosecution, courts have inherent authority to order discovery under a judge-made standard that, prior to *Armstrong*, was widely recognized in federal circuit level case law. (*Id.* at pp. 463, 469.) Although the circuit courts and the parties in *Armstrong* used a variety of phrases to describe this standard (" 'colorable basis,' " " 'substantial threshold showing,' " " 'substantial and concrete basis,' " or " 'reasonable likelihood' ") (*id.* at p. 468), in the high court's view these "labels . . .conceal the degree of consensus about the evidence necessary to meet it." (*Ibid.*) That consensus, the court concluded, was best captured in the formulation delineated in *Berrios*, *supra*, 501 F.2d 1207—there must be " 'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." (*Armstrong*, at p. 468, quoting *Berrios*, at p. 1211.)

But the *Armstrong* court laid down an important caveat. Where an application for discovery is made under *Berrios*, the court held it must be subjected to rigorous evidentiary scrutiny, and may be denied outright, because of the presumption of regularity accorded to prosecutorial decisionmaking. "Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one," the court explained. (*Armstrong*, *supra*, 517 U.S. at p. 463.) "These cases afford a 'background presumption[]' . . . that

18

the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." (*Id.* at pp. 463–464.) Because "[d]iscovery . . . imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution" (*id.* at p. 468), and because discovery "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." (*Ibid.*) On the record presented in *Armstrong*, the proof fell short of this standard. (*Id.* at p. 470.) All the defendants presented to prove that "similarly situated" non-black defendants were not prosecuted in federal court, the court found, was hearsay and anecdotal evidence. (*Ibid.*) In absence of competent proof of one of the two elements of a selective prosecution claim—the first prong, discriminatory effect, which requires a showing of disparate treatment vis-à-vis individuals of another race—there was no right to discovery. (*Ibid.*)

Race-based selective prosecution (*Griffin v. Municipal Court* (1977) 20 Cal.3d 300) is the equal protection analogue to a statutory theory of racially disparate treatment under section 745, subdivision (a)(3). Prior to *Armstrong,* the threshold showing for discovery in selective prosecution cases in California—at least until 1990, when the Legislature codified the rules of discovery in criminal cases, as we explain in more detail below—was governed by *Griffin* and *Murgia v. Municipal Court* (1975) 15 Cal.3d 286. *Griffin* and *Murgia*, taken together, enunciated a "plausible justification" standard that served as the California counterpart to the federal *Berrios* line of cases. (See *People v. Superior Court* (*Baez*) (2000) 79 Cal.App.4th 1177,

1188.)[9] While the requisite showing to secure discovery under *Griffin* and *Murgia* was less stringent than ultimately came to be the case under *Armstrong*, those cases, too, like *Armstrong*, required sufficient proof to make out a prima facie case of selective prosecution. (*Griffin*, at p. 302; *Murgia*, at p. 301.) And like *Armstrong*, *Griffin* and *Murgia* are founded on the discriminatory purpose paradigm in equal protection jurisprudence. (*Griffin*, at p. 306; *Murgia*, at p. 300.) When discovery in criminal cases was codified in 1990, *Armstrong* superseded *Griffin* and *Murgia* in cases where defendants sought nonstatutory discovery to support a theory of selective prosecution in violation of the equal protection clause. (*Baez*, at pp. 1187–1188 & fn. 9.)

As we explain below, we conclude that, in section 745, subdivision (d), the good cause standard set by the Legislature is significantly lower than the rigorous standard announced in *Armstrong*, and is in some respects lower than the standard that preceded it under *Griffin* and *Murgia*.

## III. DISCUSSION

### A. *General Principles Guiding Our Analysis*

"Writ review is appropriate in discovery matters where, as here, it is necessary to address 'questions of first impression that are of general importance to the trial courts and to the [legal] profession, and where general

---

[9] The "plausible justification" standard was first enunciated in *Ballard v. Superior Court* (1966) 64 Cal.2d 159, which held: "A defendant's motion for discovery must . . . describe the requested information with at least some degree of specificity and must be sustained by plausible justification. [¶] As Chief Justice Traynor has written 'A showing . . . that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense . . . .' " (*Id.* at p. 167, quoting Traynor, *Ground Lost and Found in Criminal Discovery* (1964) 39 N.Y.U. L.Rev. 228, 244, italics omitted.)

20

guidelines can be laid down for future cases.' [Citation.] The standard of review for a discovery order is abuse of discretion, because management of discovery lies within the sound discretion of the trial court." (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 987.) We review the factual underpinnings of a discretionary determination for substantial evidence (*ibid.*), but where such a determination rests on "incorrect legal premises," our review is de novo (*People v. Landers* (2019) 31 Cal.App.5th 288, 304; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [discretion "must be exercised within the confines of the applicable legal principles"]).

To our knowledge, we are the first appellate court to address the discovery provision of the Racial Justice Act, including its good cause requirement. " ' " 'As in any case involving statutory interpretation, our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning.' " ' [Citation.] '[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible.' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

"If the language of a statutory provision remains unclear after we consider its terms, structure, and related statutory provisions, we may take account of extrinsic sources—such as legislative history—to assist us in discerning the relevant legislative purpose." (*Gund v. County of Trinity* (2020) 10 Cal.5th 503, 511.) Uncodified legislative findings may also be consulted. While legislative findings " ' " 'do not confer power, determine rights, or enlarge the scope' " ' " of the Act itself as codified, they " ' " 'properly may be utilized as an aid in construing' [a statute]." ' " (*People v. Flores* (2020) 44 Cal.App.5th 985, 995.)

21

Because uncodified findings of legislative intent are voted upon by the entire legislative body, enrolled and signed by the Governor, they may be entitled to somewhat greater weight than traditional legislative history materials (e.g., draft language of bills, committee reports, bill analyses). (See *California Housing Financial Agency v. Elliott* (1976) 17 Cal.3d 575, 583 [legislative findings, while not binding on the courts, "are given great weight and will be upheld unless they are found to be unreasonable and arbitrary"].) Findings of this type are sometimes so general that they provide little value in resolving a particular issue of statutory construction, but not always. Given the specificity of the findings accompanying the Racial Justice Act, we give the detailed statement of intent we have here considerable weight.

We begin our analysis with the recognition that discovery in criminal cases is governed by a statutory scheme that, with certain specified exceptions, is designed to be reciprocal and exclusive. (See §§ 1054, subd. (e) ["no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States"], 1054.5, subd. (a) ["[n]o order requiring discovery shall be made in criminal cases except as provided in this chapter"].) This statutory discovery scheme was added to the Penal Code by Proposition 115 in 1990 and may be found at Penal Code, part 2, title 6, chapter 10, section 1054 et seq. (Chapter 10). Because section 745, subdivision (d) constitutes an "express statutory provision" authorizing defense-side discovery, it is now one of the exceptions to Chapter 10. Most discovery under Chapter 10 is self-executing, subject to curtailment upon a showing of good cause. (Pen. Code, § 1054.7.) Section 745, subdivision (d) flips that model and authorizes compelled disclosures upon a motion supported by a showing of good cause.

The legislative history shows that the involvement of the court as a gatekeeper under section 745, subdivision (d), is a significant aspect of the procedural scheme. In the original draft language of Assembly Bill 2542, the bill that ultimately became section 745, "discovery" could be originated in the mode of civil discovery, simply by "written request." (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 3.5, as amended in the Senate, July 1, 2020.) By later amendment, however, the term "discovery" was replaced with the term "disclosure" (Assem. Bill 2542, as amended in the Senate, Aug. 25, 2020)[10] under a regime where "disclosure" must be sought by motion (Assem. Bill 2542, as amended in the Senate, Aug. 20, 2020). Section 745, subdivision (d) is somewhat ambiguous as to exactly what form of disclosure may be compelled. The statutory text speaks variously of disclosure of "evidence," requests for "records or information," and compelled production of "the records" requested. (§ 745, subd. (d).) Consistent with the stated Legislative purpose, we interpret this language to authorize whatever form of disclosure will give the defense access to "all evidence" needed to prove an alleged violation of section 745, subdivision (a), where the requisites of "good cause" are met. (§ 745, subd. (d).) In a given situation, that may call for an order to produce "records," a written summary of "information," or even presentation of testimony from an authorized representative of the prosecution who can provide "information." (*Ibid.*)

---

[10] Although "disclosure" is generally more consistent with the terminology pertaining to information exchange in criminal cases under Chapter 10 (see §§ 1054.1–1054.3), the terms "disclosure" and "discovery" are used interchangeably in the criminal setting (see, e.g., Evid. Code, § 1043, subd. (a); Pen. Code., § 832.5 [*Pitchess* statute governing requests for "discovery or disclosure . . . of peace or custodial officer personnel records"]) and we understand them to be equivalent in the context of section 745, subdivision (d) motions.

## B. *The Analogy to* Pitchess *Discovery*

But what does "good cause" mean here? "It has long been recognized that '[t]he term "good cause" is not susceptible of precise definition.' " (*In re Lucas* (2012) 53 Cal.4th 839, 849.) This chameleon-like phrase takes on different meanings in different contexts. The parties and amici agree that the closest analogy is the good cause standard governing disclosure of law enforcement personnel records—*Pitchess* discovery.[11] Similar to the disclosure regime under the Racial Justice Act, a defendant seeking *Pitchess* discovery must file a motion supported by affidavits showing "good cause" for it. (Evid. Code, § 1043, subd. (b).) "Good cause" for *Pitchess* purposes exists when a defendant shows both " 'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.) *Pitchess* "good cause" is a "relatively relaxed standard[]" intended to "insure the production for inspection of all potentially relevant documents." (*Ibid.*)

Included in the *Pitchess* "good cause" calculus is the requirement for a defendant to establish a "plausible factual foundation" for officer misconduct. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1025 (*Warrick*).) To satisfy this requirement, "a defendant need only demonstrate that the scenario of alleged officer misconduct could or might have occurred." (*Id.* at p. 1016.) Critically, a defendant need not show that the alleged misconduct was "probable" or "apparently credible." (*Id.* at pp. 1025–1026.) "To require a criminal defendant to present a credible or believable factual account of, or a motive for, police misconduct suggests that the trial court's task in assessing a *Pitchess* motion is to weigh or assess the evidence. It is not. A trial court

---

[11] *Pitchess v. Superior Court, supra*, 11 Cal.3d 531.

24

hearing a *Pitchess* motion normally has before it only those documents submitted by the parties, plus whatever factual representations counsel may make in arguing the motion. The trial court does not determine whether a defendant's version of events, with or without corroborating collateral evidence, is persuasive—a task that in many cases would be tantamount to determining whether the defendant is probably innocent or probably guilty." (*Id*. at p. 1026, italics omitted.)

We agree that a discovery-triggering standard similar to the standard applicable to *Pitchess* discovery motions under Evidence Code section 1043, subdivision (b), applies to section 745, subdivision (d) motions under the Racial Justice Act. These two discovery provisions share a similar purpose, as each is designed to provide a defendant access to information that is uniquely in the possession of government officials. We can presume that the Legislature was aware how courts have interpreted the meaning of good cause for *Pitchess* discovery and intended a similar standard to apply under the Racial Justice Act. Thus, we conclude that in order to establish good cause for discovery under the Racial Justice Act, a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act "could or might have occurred" in his case. (*Warrick, supra*, 35 Cal.4th at p. 1016.) This minimal standard, in effect, restores the discovery regime that was in place under *Murgia* and *Griffin* prior to 1990, but without any need to make a prima facie showing of violation of the equal protection clause.

While the plausible justification standard we announce here is similar to the threshold showing that must be made for *Pitchess* discovery, it is in some respects even more relaxed than the "relatively relaxed standard[]" under Evidence Code section 1043, subdivision (b). (*City of Santa Cruz v.*

25

*Municipal Court*, *supra*, 49 Cal.3d at p. 84.) Good cause for *Pitchess* purposes must be supported by an affidavit setting forth a reasonable belief that the requested discovery is material to the subject matter of the case. The *Pitchess* materiality requirement also places a burden on the movant to "propose a defense or defenses to the pending charges" and a "logical link between the defense proposed and the pending charge." (*Warrick*, *supra*, 35 Cal.4th at pp. 1024, 1021.) There is no comparable affidavit requirement for a discovery motion under section 745, subdivision (d). And there is no materiality requirement, at least not in the sense that the defendant must show a "logical link" between some defense and a pending charge.[12]

The Racial Justice Act counterpart to *Pitchess* materiality is "relevan[ce] to a potential violation of section 745, subdivision (a)." (§745, subd. (d).) Since a section 745, subdivision (a) violation may be proved up in several different ways based on a variety of direct or circumstantial evidence of discrimination under subdivision (a)(1)–(4), the threshold showing for good cause must be commensurately broad and flexible. The limiting factor is "relevance" in the discovery sense—that is, each request for disclosure must be reasonably calculated to lead to discovery of admissible evidence probative

---

[12] A *Pitchess* affidavit must show, in addition, that the affiant has a reasonable belief the requested discovery is in the possession and control of the state. (*Warrick*, *supra*, 35 Cal.4th at p. 1027.) No such showing must be made under section 745, subdivision (d), because the scope of discoverability is expressly limited to documents in the "possession or control of the state." (§ 745, subd. (d).) The discovery concept of constructive possession has a well-understood meaning in the context of criminal discovery (i.e., the right to possession, not merely actual possession). For example, "[a] prosecutor's duty . . . to disclose material exculpatory evidence extends to evidence the prosecutor—or the prosecution team—knowingly possesses or *has the right to possess*." (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1314–1315, italics added; accord, *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 902–903; *People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1475.)

of a section 745, subdivision (a) violation.  This subject matter limitation on the scope of discoverable material creates an outer boundary that, if crossed, may justify an order narrowing or otherwise limiting the obligation to respond.  And as always in the context of discovery, the trial court has ample discretion to manage where the discovery-relevance boundary lies.

Our interpretation is harmonious not just with the text of section 745, but its structure as well, given the escalating burdens of proof that are evident within the statutory scheme.  To claim entitlement to discovery, only plausible justification is required, at least as a threshold matter.  Then section 745, subdivision (c) sets out the procedures for adjudicating motions brought under the Racial Justice Act.  Section 745, subdivision (c) provides that the court "shall hold a hearing" if the defendant makes "a prima facie showing of a violation" of the Racial Justice Act.  The statute defines " 'prima facie showing' " to mean that "the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred."  (§ 745, subd. (h)(2).)  The statute states that a " 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not."  (*Ibid.*)  Finally, at the last procedural step set forth in the statutory scheme, the hearing stage where the defendant may attempt to prove a violation, the burden increases to proof by a preponderance of the evidence (*id.*, subd. (c)(2)), which is a more demanding standard than either the requirement of plausible justification or the requirement of a prima facie case.  It stands to reason that the plausible justification standard, the least onerous of all three, should not be difficult to meet.

## C. *The Trial Court's Mistaken View That Young Relied Solely on His Race*

Even if we read section 745, subdivision (d) to set a minimal threshold for good cause, the Attorney General argues, "the discovery of historical charging of drug offenses in Solano County required *some* showing of charging disparity that would establish a logical link between the requested discovery and the alleged violation of section 745, subdivision (a)(3)." On this record, the Attorney General contends, Young's "only 'logical link' to an alleged charging disparity was his race." That was the trial court's rationale as well, and if the premise were factually correct—if Young indeed argued nothing more than that he is a black person who was charged with felony possession of Ecstasy for sale—the court would have been right to deny his discovery motion. But because his motion was based on considerably more than that, the court's ruling is unsupported by the record. Young argued he established good cause for discovery because (1) he is black, (2) studies in California have shown black drivers are more likely to be stopped by police than any other racial group, and (3) the circumstances of the traffic stop leading to Young's arrest suggest the traffic stop here was racially motivated.

The allegations of a racially motivated stop appear to be specific. Young contends he was stopped for traffic infractions, but he was never cited for any such infractions. He claims the stop was a pretext to order him out of his vehicle and conduct a search exceeding the scope of any genuine suspicion of illegal activity. He also alleges the use of excessive force. When, out of fear, Young questioned the need for him to leave his vehicle, he says he was forcibly removed, beaten, and thrown to the ground, even though he spoke courteously and offered no resistance. All of this took place, Young claims, in retaliation for his conduct in watching officers stopping and searching the vehicle of another motorist (i.e., "rubbernecking," which is both legal and

28

common).  And unlike a typical traffic stop in which an officer approaches a motorist from behind, seeing only the pattern of driving behavior—making it implausible that the race of the driver could be a motivating factor—Young alleges the officer who stopped him had ample opportunity to observe him and take note of his skin color.  Suffice it to say that these circumstances, if true, may amount to what is commonly known as racial profiling.[13]  While that kind of charge has never been recognized under the equal protection clause,[14] it is now cognizable under section 745, subdivision (a)(1) of the Racial Justice Act.

---

[13] *State v. Soto* (N.J. Super.Ct. Law Div. 1996) 324 N.J.Super. 66, 69; see *Atwater v. City of Lago Vista* (2001) 532 U.S. 318, 372 (dis. opn. of O'Connor, J.) (observing that, "as the . . . debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual"); *Illinois v. Wardlow* (2000) 528 U.S. 119, 133, footnotes 9 and 10 (conc. & dis. opn. of Stevens, J.) (referring to racial profiling studies in two footnotes focusing on racial disparity in police investigations); Hinton, *An Unjust Burden:  The Disparate Treatment of Black Americans in the Criminal Justice System*, Vera Institute of Justice (May 2018) page 7 ("Studies have found that police are more likely to pull over and search black drivers despite lower contraband hit rates."); *ibid.* ("Studies on police use of force reveal that black people are more likely than white people to experience use of force by police.").

[14] See Sklansky, *Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment* (1997) 1997 Sup. Ct. Rev. 271, 307–308 ("The Supreme Court has construed the Equal Protection Clause to permit almost any government action that avoids explicit discrimination, unless it can be shown to be based on outright hostility to a racial or ethnic group.  As a consequence, the Clause provides no protection against what is probably the most widespread cause today of discriminatory policing:  unconscious bias on the part of generally well-intentioned officers.  And even when a police officer *does* act out of racial animus—pulling over a black motorist, for example, simply because the officer does not like blacks—*demonstrating* that typically proves impossible."  (Italics in original.)).

Demurring to Young's factual claims about the circumstances of his arrest, the Attorney General contends that Young should be required to make "*some* showing of charging disparity" in order to obtain discovery relating to the prosecution's charging decision under section 745, subdivision (a)(3). We do not agree. In essence, the Attorney General invites us to take the same approach under the Racial Justice Act that the *Armstrong* court took in the equal protection context by making it a precondition to discovery that Young make some showing others of a different race were treated more leniently than he was treated. We decline to do so. The holding in *Armstrong*—which has long been criticized for requiring defendants to prove up their claims on the merits just to be entitled to discovery[15]—presents a quandary for defendants seeking to pursue allegations of race-based selective prosecution that we think is inconsistent with the legislative intent behind the Act. "[M]ost of the relevant proof in selective prosecution cases will normally be in the Government's hands." (*Wayte v. United States* (1985) 470 U.S. 598, 624 (dis. opn. of Marshall, J.).) Preventing a defendant from obtaining information about charging decisions without first presenting that same evidence in a discovery motion is the type of a Catch-22 the Act was designed to eliminate.

Nor are we persuaded, as the *Armstrong* Court was, that "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." (*Armstrong*, *supra*, 517 U.S. at p. 468.) While the *Armstrong* court was focused on creating a discovery-triggering

---

[15] Karlan, *Race, Rights, and Remedies in Criminal Adjudication* (1998) 96 Mich. L.Rev. 2001, 2005, 2023–2029; Jampol, *Goodbye to the Defense of Selective Prosecution, United States v. Armstrong, 116 S.Ct. 1480 (1996)* (1997) 87 J.Crim.L. & Criminology 932, 962–964.

standard in the equal protection setting that was high enough to *minimize the potential for insubstantial claims*, thereby saving prosecutors from the distraction of responding to them (*id*. at pp. 463–464)—a concern that echoes the floodgates argument derided by Justice Brennan in *McCleskey*—it appears to us that in section 745, subdivision (d), our Legislature had a different priority. The Legislature was focused, instead, on creating a discovery-triggering standard that is low enough to *facilitate potentially substantial claims*, even if it came at some cost to prosecutorial time and resources. That is a policy choice the Legislature had the prerogative to make, unfettered by the " 'background presumption' " (*Armstrong*, *supra*, 517 U.S. at p. 463) that drove the high court's decision in *Armstrong*.

**D.** ***The Attorney General's Argument That Evidence Pertinent to Section 745, Subdivision (a)(1) Cannot Justify Discovery Founded on an Alleged "Violation" of Section 745, Subdivision (a)(3)***

Undoubtedly recognizing the likely unsustainability of the trial court's premise that Young relies solely on his race, the Attorney General offers a statutory interpretation argument in defense of the court's ruling. He contends that we should affirm because evidence of racial bias in traffic stops is relevant only to an alleged "violation" of section 745, subdivision (a)(1), which specially covers situations where a law enforcement officer exhibits bias or animus towards the defendant because of the defendant's race. The Attorney General argues that if evidence of bias during traffic stops can justify discovery pertaining to the prosecution's charging decisions, which would be covered under section 745, subdivision (a)(3), "[s]uch a construction would effectively require the court to order any and all discovery sought by the defense for *any* potential violation of section 745, subdivision (a), as long as the defense provides minimal evidence of a *different* potential violation."

31

We reject this line of argument as well. The four numbered subparts within section 745, subdivision (a) do not describe independent "violations" of the statute. Rather, they describe different means of proving that the state exercised its criminal sanctions power "on the basis of race, ethnicity, or national origin" in violation of section 745, subdivision (a). The text and structure of section 745, subdivision (a) confirm this. The language immediately preceding subdivision (a)(1)–(4) states that a violation of section 745, subdivision (a) may be established by "*any of the following*," and the listed subparts (1) through (4) then follow. (§ 745, subd. (a), italics added.) Collectively, these subparts allow a defendant to proceed by direct evidence of discriminatory intent (i.e., an exhibition of "bias or animus" or use of "racially discriminatory language" (§ 745, subd. (a)(1)–(2)) or by proof of racial bias against a group of which defendant is a member based on harsher treatment of his group vis-à-vis others of a different race (§ 745, subd. (a)(3)–(4)). Within this broad scheme, which covers every stage of the prosecutorial process—from investigation through charging, trial, conviction, and sentencing—defendants may pursue different theories supported by different kinds of proof. What the Attorney General overlooks is that the evidence offered in support of a theory of violation under one subpart may be corroborative of the evidence supporting another theory of violation under a different subpart. In short, as we read them, subdivision (a), subparts (1) and (3) are not isolated pathways to proving a violation, but in a given case— this one being an example—may work in tandem.

In arguing that evidence pertaining to a theory under subdivision (a)(1) has no bearing on a theory under subdivision (a)(3), the Attorney General fails to appreciate how evidence of racial bias in arrests may be potentially relevant to an allegation of racial bias in charging. We understand the logic

of Young's theory to be as follows:  Police officers exercise broad discretion in carrying out their power to arrest, and if there is racial bias at the level of who is arrested for possession of Ecstasy for sale, the discretionary choices officers make will be reflected in the pool of suspects the District Attorney ultimately decides to charge, and *may* therefore taint the charging process. Even assuming he has presented enough to warrant an inference of racial profiling at the arrest level, we offer no view about whether such an argument might be supported here at the charging level—the statistics may show ultimately it is not—but we disagree with the Attorney General's suggestion that there is no "logical link" between the claimed evidence of racial profiling and the request for discovery of charging statistics.

A good illustration of the theory Young pursues is *Yick Wo v. Hopkins* (1886) 118 U.S. 356, a 19th century equal protection landmark and the font of modern selective prosecution law.  In *Yick Wo*, the petitioners, two Chinese nationals, were fined and jailed for operating laundries without a permit. Seeking habeas corpus relief, they argued that the San Francisco Board of Supervisors exercised arbitrary discretionary power to deny them and 200 others of Chinese descent permission to operate laundries in wooden buildings due to the risk of fire, while granting permits to 80 others of non-Chinese descent who were operating laundries "under similar conditions." (*Id*. at p. 374.)  The effect of this discriminatory pattern of granting permits was to expose only laundry operators of Chinese descent to criminal prosecution.  Granting habeas relief, the high court found that, "[t]hough the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial

of equal justice is . . . within the prohibition of the constitution." (*Id*. at pp. 373–374.) *McCleskey* treated *Yick Wo* as a "rare" artifact of a previous era of equal protection law.[16]  By endorsing statistics as an appropriate mode of proof and eliminating any requirement of showing discriminatory purpose, the Racial Justice Act revitalizes the venerable principle, recognized 135 years ago in *Yick Wo*, that we must offer a remedy where a facially neutral law is applied with discriminatory effect.

It seems fitting that this principle has been revivified by statute here in California, where it was born, but what is most significant about *Yick Wo*, as pertinent here, is its recognition that discretionary decisionmaking by the Board of Supervisors had the effect of exposing only Chinese nationals to subsequent criminal enforcement.  Justice Blackmun, dissenting in *McCleskey*, employed similar logic in rebutting what he saw as the flawed equal protection analysis by his colleagues in the majority.  Justice Blackmun pointed out that "McCleskey produced evidence concerning the role of racial factors at the various steps in the decisionmaking process, focusing on the prosecutor's decision as to which cases merit the death sentence." (*McCleskey*, *supra*, 481 U.S. at p. 356 (dis. opn.).)[17]

---

[16] *McCleskey*, *supra*, 481 U.S. at page 293, footnote 12 (describing *Yick Wo* as one of the "rare cases" in which "statistical disparities [were found] 'to warrant and require,' [citation] a 'conclusion [that was] irresistible, tantamount for all practical purposes to a mathematical demonstration,' *Gomillion v. Lightfoot* [(1960) 364 U.S 339,] 341, that the State acted with a discriminatory purpose").

[17] See *Wayte v. United States*, *supra*, 470 U.S. at page 610; *id*. at pages 630–631 (dis. opn. of Marshall, J.) (parting ways with the majority's conclusion that a policy of "passive enforcement" under which the federal government chose only certain draft resisters for prosecution had the effect of targeting those who exercised First Amendment rights; under the majority's approach, Justice Marshall reasoned, "there would have been no equal

While the *McCleskey* majority saw the various stages of discretion at issue in death penalty cases as so atomized and discrete that the weight to be given to McCleskey's evidence of prosecutorial discretion, particularly in the one county he focused on, was "limited" (*McCleskey*, *supra*, 481 U.S. at p. 295, fn. 15), Justice Blackmun recognized that each element of discretionary decisionmaking must be taken into account in interpreting the aggregate statistics. Applying that logic to this case, if—as Young alleges—there is racial discrimination by Solano County police officers in arresting people for possession of Ecstasy for sale, that *may* be reflected in downstream decisions by the District Attorney concerning whom to charge. Though no California courts have directly addressed this issue, in New Jersey allegations of racial profiling—supported by a colorable basis to substantiate them—have been held to justify discovery concerning race-based selective prosecution. (*State v. Kennedy* (N.J.Super.Ct.App.Div. 1991) 247 N.J.Super. 21, 33–34; *State v. Ballard* (N.J.Super.Ct.App.Div. 2000) 331 N.J.Super. 529, 534, 538.) We accept these New Jersey cases as correctly decided.

To be sure, we agree with the Attorney General that the statistical proof Young puts forward does not make out a particularly strong case of racial profiling. Young's argument based on statewide data and data from another county not only fails to focus directly on Solano County, but lacks any of the statistical controls that persuaded the courts in *Kennedy* and *State v. Ballard* to credit the profiling claims made in those cases. From that unimpressive foundation, he draws the inference that the Solano County

protection violation in *Yick Wo v. Hopkins*"; "[i]n *Yick Wo*, th[e] prior action was the discriminatory denial of licenses, which affected the definition of the class from which prosecutees were chosen"; "[i]n this case, the referrals made by Selective Service to the Justice Department for investigation and possible prosecution played a similar role and may also have been discriminatory").

District Attorney's charging practices are tainted with racial bias. The flaws in Young's statistical proof, however, serve to illustrate how the good cause standard works. At this stage, he need not make a strong case but only a plausible one. Here, his claim that he was closely observed before being pulled over and subjected to excessive force in the course of his arrest arguably tips the scale from a situation in which he is speculating about possible racial profiling to one in which, in his case, specific facts arguably provide circumstantial proof of the substance of the allegation.[18] Statistical discovery could bolster this claim and rationally tie it to prosecutorial decisionmaking, at least as a prima facie matter.

In the end, however, whether the allegations underscoring Young's racial profiling theory are enough to support a plausible justification that a violation of section 745, subdivision (a) could or might have occurred in his case is an issue for the trial court to assess, exercising its discretion upon an application of the correct legal standard governing good cause. Deciding pretrial discovery motions is not a function well-suited for appellate courts, since it requires careful weighing of a variety of considerations trial courts are best positioned to assess. On the limited record before us, we therefore decline to decide whether Young has shown good cause for the disclosures he requests. Having enunciated the applicable plausible justification standard,

---

[18] Cf. *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 162–163 (there was plausible justification for *Pitchess* discovery demanding all crime and arrest reports filed by two officers over a 10-year period where the defendant alleged that the officers engaged in a pattern of " 'conceal[ing] and obfuscat[ing] the true state of facts, namely that said officers or either of them were the aggressors and committed unnecessary acts of aggressive behavior, violence, excessive force or acts demonstrating racial and/or ethnic prejudice' ").

we will remand for the trial court to evaluate the issue, along with other factors that may be pertinent to good cause, as explained below.

### E. *Beyond* Pitchess*: The Full Range of Discretionary Considerations To Be Weighed on Remand*

The good cause standard applicable to *Pitchess* discovery motions supplies a useful analogy here, but in some respects the analogy is incomplete. It is incomplete because, as noted above, the concept of discovery relevance in the *Pitchess* context (which is defined by subject matter "materiality" to the defendant's defense or proposed defense) is narrower than under section 745, subdivision (d) (which is defined by whether it is reasonably calculated to show a violation of section 745, subdivision (a) has been shown). Although that difference is easy to state in the abstract, in practice it presents some formidable challenges, and given the breadth of the disclosures Young seeks, this case illustrates one of them.

Upon a comparison of the treatment of defendants of different races "who have committed similar offenses and are similarly situated," a "significant difference in seeking or obtaining convictions or in imposing sentences" will prove a violation of section 745, subdivision (a) unless the prosecution can "establish race neutral reasons for the disparity." (§ 745, subds.(a)(3), (h)(1).) Because, under this scheme, the Legislature has specified a particular class of proof—"statistical evidence or aggregate data" (§ 745, subd. (h)(1))—and that genre of proof by definition goes beyond discrete conduct by a particular actor on a particular occasion, section 745, subdivision (d) expands the reach of discovery beyond the self-limiting confines of *Pitchess* discovery, which must always be directly tied to the merits of the pending case against the defendant.

But how far beyond relevance to the merits of the defendant's case does discovery under section 745, subdivision (d) go? And what criteria should

trial courts apply in managing a request for "statistical evidence or aggregate data" (§ 745, subd. (h)(1))? These are daunting questions. Except possibly for discovery in civil class actions (see *Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 373–374) and other forms of "class-like" civil proceedings (see *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558–559), we know of no procedural setting that presents discovery questions as far-reaching as those that may arise when a defendant seeks discovery of "statistical evidence or aggregate data" as defined in section 745, subdivision (h)(1). Because a "good cause" requirement is the traditional way of conferring judicial gatekeeping discretion in discovery to prevent "fishing expeditions" (e.g., *Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 344 [enforcement of subpoena duces tecum in criminal pretrial discovery subject to good cause determination]),[19] we think the Legislature's choice to permit discovery only upon leave of court, rather than though self-executing party-initiated discovery, is particularly important when it comes to managing these difficult questions.

We need not reinvent the proverbial wheel when it comes to listing all considerations that may bear upon the proper exercise of discretion in this particular context. A vein of common law precedent, predating the codification of criminal discovery in California, supplies some general guidance. Distilling common law discovery principles that were developed in criminal cases before the enactment of Chapter 10, a Second District panel in *Alhambra, supra*, 205 Cal.App.3d 1118, enunciated a list of seven discretionary considerations trial courts should "consider and balance" in

---

[19] Prior to 1986, the civil discovery regime operated within a system in which document discovery could only be obtained upon a judicial good cause determination. (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 379; see *Elmore v. Superior Court* (1967) 255 Cal.App.2d 635, 638–640.)

evaluating pretrial discovery requests from the defense. (*Id*. at p. 1134; see *Facebook, Inc. v. Superior Court* (*Touchstone*), *supra*, 10 Cal.5th at pp. 345–347 [denoting these considerations "the *Alhambra* factors"].)  Notably, only one of the *Alhambra* factors is whether there is plausible justification for discovery. (*Alhambra*, at p. 1136 ["the trial court is required to balance a number of factors in addition to the showing of plausible justification"].)

The full list of seven *Alhambra* factors is as follows:  "(1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant has acted in a timely manner, (5) whether the time required to produce the requested information will necessitate an unreasonable delay of defendant's trial, (6) whether the production of the records containing the requested information would place an unreasonable burden on the governmental entity involved and (7) whether the defendant has shown a sufficient plausible justification for the information sought." (*Alhambra*, *supra*, 205 Cal.App.3d at p. 1134, fns. omitted.)

No hard and fast rules can be laid down for the application of this multifactor test on facts presented here, or in any other case, since it is designed to be flexible.  But starting with *Alhambra* factor 7 as a threshold consideration, we can say this much:  Where the defendant makes a showing of plausible justification that there was or could have been a violation of  the Racial Justice Act, thus triggering access to "all relevant evidence" (Assem. Bill 2542 (2019–2020 Reg. Sess.) § 2, subd. (j)) concerning a potential

violation of section 745, subdivision (a), it will likely be an abuse of discretion to "totally foreclose[]" discovery. (*Murgia v. Municipal Court*, *supra*, 15 Cal.3d at p. 305; cf. *Williams v. Superior Court*, *supra*, 3 Cal.5th at p. 559 [" 'The trial courts in exercising their discretion should keep in mind that the Legislature has suggested that, where possible, the courts should impose partial limitations rather than outright denial of discovery' "].) Even, for example, where a court is inclined to deny a motion presented so close to the date of trial that the discovery process itself threatens to interfere with the court's obligation to provide a speedy trial, such a motion should be denied without prejudice to its renewal posttrial or even postjudgment.

## IV. CONCLUSION

"Because the standard we announce is new, the proper course is to remand to the trial court for application of the . . . test formulated above to the facts of this case." (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 824; see *Guerrero v. Hestrin* (2020) 56 Cal.App.5th 172, 190 [remanding to trial court to apply correct standard in deciding litigant's application to inspect a wiretap order and related materials].)

If, on remand, Young persuades the trial court that he has a plausible justification for alleging racial bias in connection with his arrest, the Attorney General's argument that that is insufficient to warrant discovery concerning prosecutorial charging, at the end of the day, will go to the form, scope, and timing of discovery, not to whether discovery should be ordered at all. Young seeks disclosure of five years' worth of data, and data concerning not just the drug offense at issue in this case, but drug offenses under many related statutes, together with a wide range of associated information. Even if he meets the threshold standard for entitlement to discovery that we set forth in this opinion, how much of this requested data may be ordered

disclosed, when, and in what form, is for the trial court to consider, in an exercise of its discretion, weighing probative value against burden.

Accordingly, we will direct the trial court to reconsider Young's discovery motion under the standard discussed in this opinion, bearing in mind that "[t]here are few claims as serious as the charge put forth by the defendant[] here—that the government has selected [him] for prosecution because of [his] race.  Such claims deserve the most careful examination by the courts so that the prosecutorial power does not become a license to discriminate based on race.  Discovery is the crucial means by which defendants may provide a trial judge with the information needed in order to determine whether a claim of selective prosecution is meritorious."  (*U.S. v. Armstrong*, *supra*, 48 F.3d 1508, 1520, revd. on other grounds (1996) 517 U.S. 456.)

## V.  DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its June 4, 2021 order denying Young's motion for discovery under the Racial Justice Act, and to conduct a new hearing to reconsider Young's discovery motion in a manner consistent with this opinion.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
DESAUTELS, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41

Trial Court:  Superior Court of California, County of Solano

Trial Judge:  Hon. Jeffrey C. Kauffman

Counsel:  Courtney Reed, Deputy Alternate Public Defender,
Solano County Office of the Alternate Defender,
for Petitioner.

Cooley and Randall R. Lee for Ash Kalra, California State
Assemblymember, as Amicus Curiae on behalf of Petitioner.

Mary K. McComb, State Public Defender, Elizabeth Eng,
Deputy State Public Defender, as Amicus Curiae on behalf of
Petitioner.

Emi MacLean, Grayce Zelphin, and Shilpi Agarwal, for
American Civil Liberties Union Foundation of Northern
California and Equal Justice Society, as Amici Curiae on
behalf of Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant
Attorney General, Jeffrey M. Laurence, Senior Assistant
Attorney General, Seth K. Schalit and Bridget Billeter,
Deputy Attorneys General, for Real Party in Interest.